THOMAS McCARTHY *v.* BOARD OF EDUCATION
OF ANNE ARUNDEL COUNTY ET AL.

[No. 35, September Term, 1977.]

*Decided July 7, 1977.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Theodore G. Bloom* with whom were *Goodman & Bloom, P.A.* on the brief, for appellant.

*Robert C. Wilcox, Assistant County Solicitor,* with whom was *Michael R. Roblyer, County Solicitor,* on the brief, for appellee Anne Arundel County, Maryland. *Thomas J. Wohlgemuth* for appellee Board of Education of Anne Arundel County.

SMITH, J., delivered the opinion of the Court.

We shall here sustain the holding of a trial judge (Childs, J.) that Anne Arundel County Code (1967) §§ 7-300 and 301 relative to transportation of children attending schools which "do not receive state aid" were invalid.

The sections in question provide:

> **"Sec. 7-300. Use of buses by children not attending public schools.**
>
> "Whenever there are children attending schools, which schools do not receive state aid, except such schools as are operated for profit in whole or in part, the board of education of the county shall make rules and contracts for the transportation of such children to and from such schools; provided, however, that the transportation benefits accorded children under this section shall be governed by the same rules and standards applicable to and shall be neither more nor less than the transportation benefits accorded public school students by the board of education of the county."
>
> **"Sec. 7-301. Tax to be levied for bus operation; charges for use.**
>
> "The county council shall levy and appropriate annually sufficient funds to defray any cost

incurred by it in carrying into effect the provisions of the preceding section and for the establishment of new bus routes for transporting children to and from the public schools of the county, and schools other than public schools which schools do not receive state aid except such schools as are operated for profit in whole or in part, whenever such routes are necessary to effectuate the provisions of the preceding section. The transportation of children to and from schools other than public schools which · schools do not receive state aid except such schools as are operated for profit in whole or in part shall be upon such reasonable terms and conditions as the board of education may from time to time determine, but in no event shall the amount charged children attending such schools for utilizing such buses or other conveyance be greater or less than the amount charged children attending the public schools for the same kind of transportation."

Chapter 75 of the Acts of the Extraordinary Session of 1947 provided for transportation of children who attend parochial schools in Anne Arundel County "not receiv[ing] State aid" residing along highways on which regular bus service was provided by the Board of Education for transportation of children to and from public schools. The county commissioners were authorized to levy and appropriate sufficient funds to defray the cost of this service. These provisions became Anne Arundel County Code (1957), Art. 2 of the Code of Public Local Laws of Maryland, §§ 18-1 and 2. The General Assembly enacted Chapter 854 of the Acts of 1963 materially amending those sections in basically the language of §§ 7-300 and 301. This act was petitioned to referendum and defeated by the voters of Anne Arundel County at the 1964 general election. Another similar statute was enacted by the General Assembly as Chapter 732 of the Acts of 1967. It was to take effect July 1, 1969, if approved by a referendum at the general election of 1968. It, too, was defeated by the people.

Anne Arundel County Charter § 1007 states that "the County Council shall provide for a compilation and codification of all public local laws of the County, all ordinances of the County Council and all resolutions heretofore adopted by the County Commissioners having the force and effect of law . . . ." Pursuant to that authority the County Council in 1967 adopted Bill No. 18-67, an ordinance "to adopt a revision and codification of the laws of Anne Arundel County" and repealing laws not included within that code with certain exceptions. The code was appended to the ordinance. Sections 7-300 and 301 were in that code and give their source line as Chapter 854 of the Acts of 1963.

Appellant, Thomas McCarthy, "on his own behalf and on behalf of all others similarly situated," brought a declaratory judgment action. He said that he had four children attending a "non-public, parochial school, [which] does not receive State aid, and is not operated for profit in whole or in part." He sought a declaratory judgment as to his rights under §§ 7-300 and 301 and "injunctive relief to compel the defendants to carry out and perform their duties in respect to said laws and damages for their past failure to do so." Named as parties defendant were the Board of Education of Anne Arundel County (the Board of Education), the members of the County Council of Anne Arunel County "in their official capacity," the County Executive of Anne Arundel County "in his official capacity," and Anne Arundel County (the County).

The trial judge found that the provisions in question "were not legally adopted prior to the enactment of 18-67 [and thus] the County Council was without the power or authority to enact new legislation through codification," pointing out that "[i]f this were not so, the process of codification would develop into a nightmarish process, involving the necessity for all manner of security provisions lest one or more special interest groups might circuitously succeed in surreptitiously inserting within the codification material legislation which might never survive the strictures of Section 307 [of the Anne Arundel County Charter] or the

referendum process now specifically declared to apply to home rule legislation."

A prompt appeal was entered to the Court of Special Appeals. Because of the public importance of the question presented we granted the writ of certiorari prior to consideration of the case by that court.

The County and the Board of Education present three different arguments to us as to why the trial judge was correct, (1) that the sections are a nullity because they were never intended to become law nor were they validly enacted into law as prescribed by the Anne Arundel County Charter, (2) that the County has no authority under the express powers act to enact such legislation, and (3) the field of education has been preempted by the General Assembly, thus rendering local enactments affecting boards of education void. Obviously, if we were to agree with them on any one of these points the judgment would be affirmed. We prefer to place our decision on the doctrine of preemption rather than on one of the other two grounds. Our preference should not be interpreted, however, as an intimation that we are of the opinion that the decision of the trial judge could not be sustained on either of those other two grounds.

If there has been but little application of the preemption doctrine in Maryland, it must be remembered that it has been only in comparatively recent years that any subdivision in Maryland, other than Baltimore City, has had general legislative power. This authority came with the adoption of Art. XI-A of the Maryland Constitution by the people in 1915. *See State v. Stewart*, 152 Md. 419, 422, 137 A. 39 (1927), for an explanation of the reason for adopting home rule. Such legislative power does not reside in Baltimore City or a county unless it adopts home rule. Baltimore City adopted a charter soon after the adoption of the home rule amendment but it was not until 1948 that home rule came to the first of the counties, Montgomery.

In *City of Baltimore v. Sitnick and Firey*, 254 Md. 303, 255 A. 2d 376 (1969), this Court, in a comprehensive opinion by Judge Finan, set forth the limitations on the concurrent power of local governments to supplement state legislation.

We recognized there three grounds on which otherwise valid local legislation might be invalidated because of State legislation concerning the same matter: (1) ordinances which conflict with public general law, (2) ordinances which deal with matters which are part of an entire subject matter on which the General Assembly has expressly reserved unto itself the right to legislate, and (3) ordinances which deal with an area in which the General Assembly has acted with such force that an intent to occupy the entire field must be implied. In *Sitnick* Judge Finan said for the Court:

> "[W]e wish it understood that there may be times when the legislature may so forcibly express its intent to occupy a specific field of regulation that the acceptance of the doctrine of pre-emption by occupation is compelled . . . ." *Id.* at 323.

We had occasion in *County Council v. Montgomery Ass'n,* 274 Md. 52, 325 A. 2d 112, 333 A. 2d 596 (1974), to apply this latter theory of preemption. In that case Montgomery County had enacted three ordinances designed to regulate the campaign finance practices of candidates for county executive and the county council in that county. Judge Eldridge reviewed for the Court the constitutional and statutory provisions relative to elections which "demonstrate[d] that the General Assembly is obligated to enact and has enacted a comprehensive plan for the conduct of elections in Maryland," including "detailed provisions governing the financing of election campaigns in this state." We said that this "reveal[ed] the purpose of the General Assembly to occupy the field of election finances."

Maryland's concern with educational matters goes back to colonial times. *See, e.g.,* B. Steiner, *History of Education in Maryland* 22 (1894), referring to "[t]he act of 1696 [which] created a corporation of not exceeding 20 persons by the name of the rectors, governors, trustees, and visitors of the free schools of Maryland . . . ." This interest in education continued after the Revolution as demonstrated by the granting of charters to Washington College and St. John's College by Chapter 8 of the Acts of 1782 and Chapter 37 of

the Acts ·of 1784, respectively, followed by an attempt to unite them as the University of Maryland. *See Steiner, op. cit.* 69-71 and *St. John's College v. State,* 15 Md. 330 (1860).

The General Assembly enacted Chapter 162 of the Acts of 1825 providing for public instruction throughout the State in primary schools. This was to be effective, however, only in those counties in which by a majority vote the people declared in its favor. Special provision was made for Baltimore City, which provision brought the confrontation in *Schl. Cms. of Balt. v. St. Bd. of Edn.,* 26 Md. 505 (1867), resulting from the adoption of the Constitution of 1864 and the subsequent enactment of Chapter 160 of the Acts of 1865. Article VIII of the Constitution of 1864 provided·for the appointment of a State Superintendent of Public Instruction, a State Board of Education, and such school commissioners in the counties as the State Superintendent of Public Instruction might deem necessary. The General Assembly was mandated "at its first session after the adoption of th[at] Constitution [to] provide a uniform system of Free Public Schools, by which a school sh[ould] be kept open and supported free of expense for tuition in each school district, for at least six months in each year . . . ." It was pursuant to that mandate that Chapter 160 of the Acts of 1865 was passed. It provided for a uniform system of free public schools, a State Board of Education, a State Superintendent, etc.[1] *Sch. Coms. of Balt.* held that Baltimore City was embraced within the system of public schools established by the 1865 act and that this law vested in the State Board of Education the exclusive power and authority to select and prescribe the textbooks to be used in the public schools of that city. Accordingly, a writ of mandamus was directed to issue commanding the School Commissioners of Baltimore City to use in its schools such textbooks as had been or might be prescribed by the State Board of Education as the uniform series of textbooks to be used in the schools of Maryland.

---

1. One may draw the inference that these provisions were not popular in some quarters. *See* the comments and extended debate relative to the education provisions in our present Constitution as reported in P. Perlman,

The present provisions of the Maryland Constitution relative to public education are also found in Art. VIII. Sec. 1 directed the General Assembly at its first session after the adoption of the Constitution of 1867 to "establish throughout the State a thorough and efficient System of Free Public Schools" and to "provide by taxation, or otherwise, for their maintenance." By § 2 the system as then constituted was to remain in effect until the end of the first session of the General Assembly, after which it should "then expire; except so far as adopted, or continued by the General Assembly." Sec. 3 provides, "The School Fund of the State shall be kept inviolate, and appropriated only to the purposes of Education." The provisions of Art. VIII are precisely in the form originally submitted by the Committee upon Education to the Constitutional Convention of 1867. *See Proceedings Maryland State Convention* 139 (1867), although there were a number of attempts to change this language, particularly relative to Baltimore City. *See* P. Perlman, *Debates of the Maryland Constitutional Convention of 1867*, at 198-203, 243-48, 251-57 (1923). The General Assembly responded by enacting Chapter 407 of the Acts of 1868 creating a new article entitled "Public Education." It provided in comprehensive form for education in the State including qualifications of teachers, a specification that there should be a State tax of 10 cents on each $100 of assessable value for school purposes, and a provision that:

"In every district school there shall be taught Orthography, Reading, Writing, English Grammar, Geography, Arithmetic, History of the United States, the Constitution of the United States, the Constitution of the State of Maryland and Good Behavior. Algebra, Book-keeping, Natural Philosophy, Vocal Music, Drawing, Physiology, the Laws of Health and of Domestic Economy shall also

Debates of the Maryland Constitutional Convention of 1867, 198-203, 243-48, 251-57 (1923). The Constitutional Convention of 1867 convened on May 8, 1867. Schl. Coms. of Balt. v. St. Bd. of Edn., 26 Md. 505 (1867), was decided on March 12, 1867. It may have provided fire for the debate, although that decision does not appear to have been mentioned in the course of the debate.

be taught whenever the School District Board shall deem it expedient."

Revision was made by Chapter 311 of the Acts of 1870 which, among other things, provided for a Board of State School Commissioners. Further revision came by Chapter 377 of the Acts of 1872 which included among its very comprehensive provisions the progenitor of present Code (1957, 1975 Repl. Vol.) Art. 77, § 38 providing that county boards of education are "declared to be a body politic and corporate by the name and style of the Board of Education of . . . . . . . . . . . . . . County," the terminology used in 1872 having been "Board of County School Commissioners."

In *Clauss v. Board of Education*, 181 Md. 513, 30 A. 2d 779 (1943), Judge Ogle Marbury observed for the Court:

> "[Maryland Code (1939)] Article [77] was passed in substantially its present form by Chapter 506 of the Acts of 1916. There have, of course, been amendments added since. The Act of 1916 was passed as a result of the report of a commission authorized by Chapter 844 of the Acts of 1914. This commission requested the General Education Board to undertake a survey of public education in this State. This was done, and a most thorough and exhaustive report was filed, prepared under the direction of Abraham Flexner and Dr. Frank P. Bachman. This report was submitted to the Governor, transmitted by him to the Legislature of 1916, and as a result, the present system of education was adopted." *Id.* at 518.

*See* A. Flexner and F. Bachman, *Public Education in Maryland* (1916). Survey of the educational system from the State level has continued. *See, e.g.*, Chapter 610 of the Acts of 1939 providing for "a survey of the public elementary and high schools and the State Teachers' Colleges of the State of Maryland" and *1941 Survey of the Maryland Public Schools and Teachers Colleges* (1941).

The Maryland laws relative to public education were extensively revised by Chapter 405 of the Acts of 1969 and

are now found in Code (1957, 1975 Repl. Vol., 1976 Cum.
Supp.) Art. 77. It begins with § 1 providing:

"There shall be throughout the State of Maryland
a general system of free public schools, according to
the provisions of this article. 'Public schools' as
used in this article shall mean schools at the
elementary and secondary level."

Matters of elementary and secondary education affecting
the State and the general care and supervision of public
elementary and secondary education are entrusted to the
State Department of Education, the head of which is the
State Board of Education. It is composed of nine persons
appointed for terms of five years. The State Superintendent
of Schools is "the chief executive, the secretary, and the
treasurer of the State Board." That board is required by § 6
to "determine the elementary and secondary educational
policies of this State" and to "adopt bylaws, rules, and
regulations for the administration of the public school
system which, when adopted and published, have the force
of law." It is to "conduct, with and on the advice of the State
Superintendent of Schools, investigations relating to the
educational needs of the State and the means of improving
educational conditions . . . ." It also is to "establish, upon the
recommendation of the State Superintendent of Schools,
standards of, and guides for, the planning and construction
of school building projects." By § 10 it is mandated "from
time to time [to] adopt bylaws, rules and regulations for the
ratio of professional staff members to pupils enrolled in the
elementary and high schools, or any combination of grades
thereof . . . ."

Under § 11 (c) "[t]he State Board [is], with the advice of
the State Superintendent of Schools, [to] prescribe
minimum requirements for issuing certificates and
diplomas by the public and private noncollegiate educational
institutions in Maryland." "Noncollegiate educational
institution" is said by § 11 (a) to mean "a school or other
institution that offers an educational program but is not an
institution of postsecondary education, as defined in Article

77A, § 32A (a)." The latter term is defined as "a school or other institution that offers an educational program within the State for persons 16 years of age or older who have graduated from or left elementary or secondary school. It does not include an adult education, evening high school, or high school equivalence program conducted by a public school system of the State." Every noncollegiate educational institution, other than "an institution operated by a bona fide church organization, including the Amish and Mennonite church parochial schools" is required by § 11 (d) to "obtain a certificate of approval from the Board in order to commence or continue to operate or function in this State." Under certain specified procedures the State Board may direct a noncollegiate educational institution to cease operations if found not to be in compliance with the State Board's conditions or standards. Under § 13 any nonpublic secondary school or collegiate institution, including those operated by bona fide church organizations, prior to discontinuance of operations is required to "cause to be filed with the State Superintendent of Schools the original or legible true copies of all essential records pertaining to the academic achievements of all former students who attended the said school."

Sec. 14 requires "all private educational associations, corporations, or institutions to report annually ... as to enrollment and courses of study on such forms as the State Board of Education may provide."

The "basic policy and guidelines for the program of instruction for the public schools" by § 15 is to be prescribed by the State Board of Education "with and on the advice of the State Superintendent of Schools . . . ." Likewise, under § 16 it prescribes "bylaws, rules and regulations, for the certification of teachers and other professional personnel . . . ." It also specifies "the required items of information to be recorded by the Board of School Commissioners of Baltimore City, the county boards of education, school officials, and teachers" and all educational records to be kept. Reports are to be made using forms prescribed by the State Board.

By § 18 the State Board is authorized "in its discretion [to] prepare and publish annually a list of approved colleges and universities and [to] determine by bylaws the standards for said approval."

The State Board is directed by § 19 to "transmit to the Governor an annual State public school budget including, subject to existing laws, the appropriation for the State Department of Education; State aid to the counties and Baltimore City for current expenses and for the construction of school buildings; and necessary costs of transporting pupils to public schools as approved by the State Superintendent of Schools." This budget is to be certified to by the State Superintendent prior to transmittal to the Governor. Under Maryland Constitution Art. III, § 52 (11) this estimate is mandated to "be included in the Budget [transmitted by the Governor to the General Assembly] without revision." *See Md. Act. for Foster Child. v. State,* 279 Md. 133, 141, 367 A. 2d 491 (1977). Moreover, by Constitution Art. III, § 52 (6) the General Assembly is forbidden to amend the budget bill "so as to affect . . . the provisions made by the laws of the State for the establishment and maintenance of a system of public schools . . . ."

The State Board of Education is required to submit a report to the Governor each year relative to "support, conditions, progress, and needs of education throughout the State" and to recommend to the Governor and the General Assembly "such additional legislation, or changes in existing legislation, as may be deemed desirable."

The qualifications and powers of the State Superintendent of Schools are set forth in Art. 77. Among other things, he is empowered by § 24 "to cause the State Comptroller, through written notification, to withhold in case of violation of any of the provisions of [Art. 77] or of the bylaws enacted and published by the State Board of Education, any part or all of any appropriation made by the General Assembly to any educational institution or to withhold any part or all of any payment to county school boards from funds budgeted by the State of Maryland . . . ."

All proposals for the purchase of ground, school sites, or buildings; the sale of the same; plans and specifications for the remodeling of school buildings in excess of $100,000; plans and specifications for the construction of new buildings, and change orders in excess of $25,000 for the remodeling, restoration, or construction of school buildings are all made subject to the approval of the State Superintendent of Schools. Moreover, if construction is "done by contract, [then under § 26] the contract shall be invalid and of no effect without the written approval of the State Superintendent of Schools."

The authority of the State Superintendent is extended under § 28 to approval of "any program of instruction offered by any State institution under the supervision of the Department of Juvenile Services, Department of Correctional Services, and the Department of Mental Hygiene . . . ."

Art. 77, § 34 states that "[e]ducational matters affecting the counties shall be under the control of a county board of education in each county," with "[t]he geographical boundaries of the county school systems [to] be coterminous with the geographical boundaries of the respective counties . . . ." Provision is made in Art. 77 for the manner of selection of county board of education members, with variance between counties as to number of members, the method of selection, and the length of term of office. By § 35 (d) in Anne Arundel County "there shall be an additional voting member of the Board of Education who shall be a regularly enrolled senior year student of good character and in good standing from an Anne Arundel County public high school." Each county board is to select a county superintendent of schools who "shall be executive officer, the secretary, and treasurer of the county board of education, but shall not be deemed a public officer under the Constitution or the laws of this State."

The duties of the county boards are prescribed by this article. These include a determination of "the geographical attendance areas for all . . . schools established" within the jurisdiction of each county board. Provision is made in § 47

that "[w]hen the county boards of education, with the approval of the State Superintendent of Schools, shall determine that grounds, school sites, or buildings are no longer needed for school purposes, they shall be transferred by the county boards to the county commissioners or county council and may be utilized, sold, leased, or otherwise disposed of (except by gift) by the county commissioners or county council . . . ." The right of eminent domain is granted by § 51 to county boards of education. In those instances in which schools may be located "in one county . . . but near the dividing line of an adjoining county" it is stated in § 52 that they "shall be free to the children of the adjoining county to the extent [t]hereinafter provided," with further provision made for such situation. A county board of education is granted power to consolidate schools "wherever in its judgment it is practicable."

Art. 77 provides relative to school terms, hours and days that schools are to be open and school holidays. The General Assembly has further provided in Art. 77 relative to vaccination of school children; a school health program; hearing and vision screening tests; that workers in schools must be free from tuberculosis in a communicable stage; a program of physical education; a program of safety education; a program of drug education; a requirement for protective eye devices; driver education; the number of fire drills (at least 10) to be conducted during each school year; compulsory school attendance; reports of absences and maladjustment; provision for suspension and expulsion; searches of students and schools; use of school property for other than school purposes; that "[p]rincipals, teachers, and school security guards in every public elementary and secondary school . . . may intervene in any fight or physical struggle which takes place in their presence in school buildings or on school grounds, between or among students or any other persons"; corporal punishment in certain counties, and the duties of boards of education relative to handicapped children.

The above is but a partial recital of the legislative involvement of the General Assembly in education in

Maryland. No summary of the State's involvement would be anywhere near complete, however, without mention of Code (1957, 1975 Repl. Vol., 1976 Cum. Supp.) Art. 77, § 130A, originally enacted by Chapter 624 of the Acts of 1971, under which the State is obligated to "pay the costs in excess of available federal funds of all public school construction projects and public school capital improvements in the counties and Baltimore City which have been approved by the Board of Public Works and for which the contracts have been executed on or after July 1, 1971."

In the field of transportation the State not only has paid the costs within prescribed limits, but under the authority of Art. 77, §§ 19 and 99 it has promulgated policies governing approval of pupil transportation costs for inclusion in the minimum program. *See, e.g.,* 3:16 Md. R. 854-55 (August 4, 1976), 3:12 Md. R. 671-76 (June 9, 1976), 2:24 Md. R. 1482-83 (October 29, 1975), and 2:20 Md. R. 1312-16 (September 3, 1975). The Motor Vehicle Administration has adopted a regulation governing the transportation of school children. *See* 2:29 Md. R. 1741 (December 24, 1975) and 2:24 Md. R. 1506 (October 29, 1975). Moreover, "[t]he Motor Vehicle Administration by and with the advice of the State Department of Education" is directed by Code (1957, 1970 Repl. Vol., 1976 Cum. Supp.) Art. 66½, § 15-109 (a) to "adopt and enforce regulations not inconsistent with th[at] article to govern the safe operation of all school vehicles." Art. 66½, § 11-1118 specifies the manner in which school buses are to be refueled; that the driver of a bus is to be in charge "except in the presence of a teacher"; the number of standing pupils who may be transported; circumstances in which pupils are not permitted to stand; that pupils are not "permitted to operate the front door opening mechanism except in times of actual emergency"; certain requirements as to methods of operation, and that no pupil shall be required to sit on the floor of any school bus.

In *Clauss v. Board of Education, supra,* 181 Md. 513, this Court was faced with the question of whether an employee of the Board of Education of Anne Arundel County engaged in extra-hazardous work was entitled to compensation under

the workmen's compensation law for accidental personal injury arising out of and in the course of his employment. The appellee there, in an effort to avoid such liability, pointed to Constitution Art. VIII, § 3 providing that "[t]he School Fund of the State shall be kept inviolate, and appropriated only to the purposes of education." Judge Ogle Marbury said for the Court in that case:

> "The meaning of the Constitution is not restricted to the meaning of particular words employed as they were understood at the time of its adoption. It is not to be supposed that the framers of the Constitution of 1867 did not expect the system of education then in force to be changed or improved. They could not, of course, foresee what changes were to come, so they wisely did not attempt to define what they meant by education. They left that to be interpreted in the light of conditions at any given time when such a question should arise. Education in 1867, as we have shown, did not include the employment of repair men for heating systems in public schools. Education in 1943 does include such employment, because that is the only way the kind of schools now found necessary for the education of the children of the State can be made usable." *Id.* at 523.

Vast numbers of children are transported to schools in buses today. Schools have become larger and larger in size with the consolidation of schools. The importance of transportation as an element in education has been recognized by the mandate of the General Assembly that the cost of transporting children to the public schools be borne by the State. Thus, under the authority of *Clauss*, we have no difficulty in concluding that such transportation is an integral part of education as we know it today.

In *Bd. of Ed. v. Montgomery County*, 237 Md. 191, 197, 205 A. 2d 202 (1964), our predecessors specifically held that a county "board of education is not a part of the executive

branch of the county government nor an agency under its control," adding:

> "It is an agency financed wholly or in part by county funds, but, like bi-county commissions such as the Maryland-National Capitol Park and Planning Commission and the Washington Suburban Sanitary Commission, it is not subject to the charter budgetary requirements. *Montgomery County v. Yost*, 223 Md. 150, 162 A. 2d 462 (1960). The State Board of Education has important supervisory powers over the local boards. *Wilson v. Board of Education*, 234 Md. 561, 200 A. 2d 67 (1964); *Zantzinger v. Manning*, 123 Md. 169, 90 Atl. 839 (1914); see also *School Com. of Car. Co. v. Breeding*, 126 Md. 83, 94 Atl. 328 (1915)." *Id.* at 197.

In the recent case of *Board v. John K. Ruff, Inc.*, 278 Md. 580, 366 A. 2d 360 (1976), we were concerned with the doctrine of sovereign immunity as it applied to trustees of a community college. We quoted at page 586 from *Williams v. Fitzhugh*, 147 Md. 384, 128 A. 137 (1925):

> "Public education is a highly important interest of the State government. In the promotion of that interest the State is acting through an agency which the Legislature created for that purpose and to which broad administrative powers have been delegated. In performing its functions the State Board of Education is representing and exerting the State's authority. As a governmental agency of the State it shares the immunity from suit to which the State itself is entitled, in the absence of any legislative waiver of that exemption." *Id.* at 386.

In *Bd. of Education v. Alcrymat Corp.*, 258 Md. 508, 266 A. 2d 349 (1970), there had been a failure to plead governmental immunity on behalf of the Charles County Board of Education. We held it immune from suit, nevertheless.

This case represents an excellent example of what the

Court had in mind in *City of Baltimore v. Sitnick & Firey,*
*supra,* 254 Md. 303, 323, when it referred to the fact that the
General Assembly might "so forcibly express its intent to
occupy a specific field of regulation that the acceptance of
the doctrine of preemption by occupation is compelled . . . ."
Our recital of legislation by the State in the field of
education demonstrates the occupation of that field by the
State. We conclude, therefore, that the County Council of
Anne Arundel County was without power to legislate in this
field and to place additional duties upon a State agency, the
Board of Education of Anne Arundel County.

> *Judgment affirmed; appellant to*
> *pay the costs.*