Dear Ms. Rehrmann:
You have requested our opinion whether Harford County may adopt, by ordinance, a program to provide grants to individual public schools as a reward for achieving performance standards set by a county-appointed commission.
A county grant program raises a legal issue only to the extent that the program is administered outside the existing statutory framework for county financial support of a school system. Under § 5-103(c) of the Education ("ED") Article, Maryland Code, Harford County may provide additional funds to the board of education "to support improved and additional programs." This provision surely contemplates a cooperative effort between the county and the board to identify criteria for these additional funds. We recommend that this cooperative approach, which is free of legal doubt, be given first consideration.
Nevertheless, should the county wish to pursue a more independent approach in encouraging improved school performance, the county may do so in a limited way. In our opinion, a charter home rule county like Harford County may establish a performance incentive grant program if the program is a purely voluntary, noncontractual arrangement that rewards past performance and neither imposes future conditions on the operation of local schools nor interferes with the discretion of State and local educational authorities. Certain features of a proposed 1996 Harford County ordinance do not satisfy this condition, although we believe that it is possible to fashion valid county legislation.
 I Background
A. The 1996 Proposal
On April 2, 1996, Bill 96-21 was proposed by the Harford County Administration and introduced in the County Council to establish a "school-based performance incentive program." Although this measure was not enacted, we understand that you hope to resubmit similar or modified legislation for the Council's consideration.
The 1996 bill would have created the Harford County Commission on School Board Performance Incentive Program ("the Commission"), a county body of 13 persons, including one member of the Harford County Board of Education. The Commission would be authorized to establish objective performance standards for local public schools and to provide a program of incentives to individual schools in the county that are meeting, exceeding, or making significant progress toward meeting these standards. The legislation contemplated the submission of funding proposals by individual "school improvement teams," composed of teachers and parents, that were obliged to demonstrate that the funds spent "will help increase school performance," be consistent with the school's improvement plan, and not be used to supplement ordinary operating costs. Had this measure passed, it would have been funded through a $500,000 appropriation in the county's budget ordinance.
B. Conflicting Opinions
The issue of the county's authority to establish a school-based performance incentive program has been the subject of three opinions: one written by the attorney for the County Council, one by the County Attorney's Office, and one by the county's bond counsel.
The Council Attorney concluded that Bill 96-21 was preempted by State law:
 The bill, in effect, establishes a commission which will promulgate policy regarding how schools will receive additional monies above and beyond that which is provided for within the State mandated budget scheme. In other words, Bill 96-21 appears to create an additional category not authorized by state legislation and not included in the board of education's budget.
Memorandum to Council Members from Council Attorney (May 27, 1996).
By contrast, the County Attorney opined that the legislation was not preempted, because "the program creates no requirement or burden on the school system [and] because the program is no more than an additional `prize' or `award' for which the schools are free to compete — subject only to the direction of the school system hierarchy." Opinion of the County Attorney (May 24, 1996). The County Attorney also concluded that grants under the program would be "one-time money" exempt from maintenance-of-effort requirements imposed by ED § 5-202.
Finally, the law firm of Miles and Stockbridge, the county's bond counsel, concluded that establishment of the grant program was within the county's home rule powers under Article 25A, § 5(S), and was not in conflict with or impliedly preempted by any provision of the Education Article. Memorandum to County Executive (May 28, 1996). Specifically, this opinion noted that the incentive program was not part of the budgetary process and that State law did not prevent alternative sources of school funding outside the mandatory budget process.
 II County's Authority to Make Grants
Although the Express Powers Act for charter counties, Article 25A, § 5 of the Maryland Code, makes no specific mention of a county's power to make a grant or a gift to public agencies or institutions, we believe that this authority is implicit in the Act. Specifically, § 5(S) provides, in relevant part, that a charter county is authorized:
 [T]o pass all ordinances, resolutions or bylaws, not inconsistent with the provisions of this article or the laws of the State, as may be proper in executing and enforcing any of the powers enumerated in this section or elsewhere in this article, as well as such ordinances as may be deemed expedient in maintaining the peace, good government, health and welfare of the county.
 Provided, that the powers herein granted shall only be exercised to the extent that the same are not provided for by public general law. . . .
This provision has been interpreted broadly to authorize the expenditure of county funds to private or semi-private entities as long as a public purpose is served. See Snowden v. Anne ArundelCounty, 295 Md. 429, 435, 456 A.2d 380 (1983) (indemnification of county police and fire department personnel); Prince George'sCounty v. Chillum-Adelphi Vol. Fire Dep't, Inc., 275 Md. 374, 381,340 A.2d 265 (1975) (grants to volunteer fire companies).[1]
In our view, this authority includes the power to make a grant for a public purpose to a public entity, such as a public school located within the county, to the extent that the grant is not inconsistent with or preempted by State law. SeeFirst Nat'l Bank of Birmingham v. Walker County Bd. of Educ.,11 So.2d 297 (Ala. 1943); 15 Eugene McQuillen, MunicipalCorporations § 39.25 (3d ed. 1995).
 III Preemption and Conflict Issues
A. Implied Preemption and the Education Article
In McCarthy v. Board of Education, 280 Md. 634, 374 A.2d 1135
(1977), the Court of Appeals held that a charter county lacked the power to require a board of education to provide bus transportation for parochial school students. This holding was based on a finding of implied preemption: State legislation in the field of education, the Court concluded, "demonstrates the occupation of that field by the State." 280 Md. at 651. Therefore, a charter county "was without power to legislate in this field and to place additional duties upon" the board of education. Id. The force of this implied preemption would invalidate even local legislation that is "harmonious" with State law. Cf. De Canas v. Bica, 424 U.S. 351, 356 (1976) (describing effect of preemptive federal law). Thus, because the proposed county incentive program relates to the field of education, the question arises whether McCarthy precludes this particular exercise of county power. In our view, it does not.[2]
The subject of the incentive program, financial aid for schools, falls within the core of the "field" occupied by the State.[3] Yet, this determination does not end the analysis. In Opinion No. 94-019 (March 31, 1994) (unpublished) and later in court, this office suggested that the implied preemption doctrine only limits the authority of a local subdivision to "regulate" by legislation.
The implied preemption doctrine safeguards the General Assembly's decision "to occupy a specific field of regulation. . . ."Mayor and City Council of Baltimore v. Sitnick,254 Md. 303, 323, 225 A.2d 376 (1969) (emphasis added). The doctrine prevents "future local government trespass in [an] area of exclusive legislative authority. . . ." County Council v. MontgomeryAss'n, 274 Md. 52, 60 n. 5, 333 A.2d 596 (1975). Local "trespass" occurs if a local government purports to create enforceable rights or obligations within the preempted field — in other words, attempts to regulate within that field. See, e.g., Howard Countyv. Potomac Elec. Power Co.,319 Md. 511, 573 A.2d 821 (1990) (local requirement that utilities obtain special exception status under local ordinances for siting of certain transmission lines). Local regulation creates a "dual system of regulating" the field, a duality inconsistent with the legislative goal. Montgomery Ass'n, 274 Md. at 64. Cf. English v.General Electric Co., 496 U.S. 72, 79 (1990) ("[S]tate law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.") (emphasis added).
In its most recent implied preemption case, Allied Vending,Inc. v. City of Bowie, 332 Md. 279, 631 A.2d 77 (1993), the Court of Appeals again emphasized the regulatory character of the local law. The case involved two municipal ordinances that regulated the location of cigarette vending machines through a licensing requirement. The Court held these local requirements to have been preempted by State law. In describing the factors to be examined in determining whether preemption by implication exists, the Court asked "whether the local ordinance regulates an area . . ., whether the State law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances, . . . whether the particular aspect of the field sought to be regulated by the local government has been addressed by the State legislation, . . . and . . . whether a two-tiered regulatory
process existing if local laws were not pre-empted would engender chaos and confusion. . . ." 332 Md. at 299-300 (emphases added, citations omitted).
We construed this language in Allied Vending to mean that, although a charter county could not legislate to regulate the location of cigarette vending machines, nevertheless a county was not precluded from passing a nonbinding resolution encouraging businesses to remove those machines from their premises. Our understanding of the scope of preemption was affirmed by the Circuit Court for Howard County in Allied Vending, Inc. v. HowardCounty, Case No. 94-CA-24895 (March 19, 1996) (Sweeney, J.):
 While the Council may not legislate to regulate cigarette vending machines, . . . the Council may pass a non-binding resolution expressing its opinion on this issue. Resolution 48-1994 does not create liability or create a new rule of general application, and therefore it is not legislative in the nature of an ordinance or law.
To be sure, the Harford County's school performance incentive program was proposed to be enacted legislatively as an ordinance. The County Attorney, however, characterized the measure as a purely voluntary plan that imposes no burden on the school board: "The County realizes and accepts the fact that it can neither require a school to participate in the voluntary program nor require the Board to order a school to participate." The proposed program, therefore, hardly amounts to an attempt to "regulate" education. The proposal is not preempted merely because it touches the field of education.
We doubt that any serious legal objection would be raised if the county's program rewarded schools that performed well, by county criteria, with a plaque or other form of non-monetary recognition. The overall preemption issue is no different, however, simply because the recognition takes the form of a monetary grant.
B. Specific Preemption or Conflict with the Education Article
Even if Harford County is permitted some nonregulatory authority in the field of education, the question remains whether the proposed grant program is preempted by or conflicts with specific provisions of the Education Article.
1. Education policy-making authority
Undoubtedly, the county board of education and the county school superintendent make local educational policy in each subdivision. ED §§ 4-107 and 4-205. Nevertheless, the County Attorney has characterized the performance incentive program as one conferring a prize or award on schools subject to the direction of the board of education. Accepting this characterization of the intent of the proposal, we believe that the program will not operate like many grant programs, under which a recipient is contractually bound to adhere to various conditions. See, e.g., Pennhurst State School and Hospital v.Halderman, 451 U.S. 1 (1981). If the program were one in which county educational policy standards were imposed by contract on a school receiving county funds, we would question its validity.
Rather than impermissibly establishing educational standards that a school must meet in the future, the county incentive program is more properly viewed as setting eligibility requirements for a grant for which a school may compete on the basis of its past performance. A school is not obliged to seek or accept a grant, and local education authorities remain free as a matter of policy to direct a school not to apply for or accept a grant or to accept only with the approval of the board or superintendent. Indeed, if there were a conflict between board-imposed performance standards and county-determined standards for an incentive grant, a school would be obliged to adhere to the board's standards. As long as this non-binding, non-contractual program does not interfere with the discretion of local educational authorities or place conditions on a school that receives a grant, however, it would not be preempted by or in conflict with ED §§ 4-107 and 4-205.
2. State School Performance Program
At its 1996 session, the General Assembly established a program under which the State Superintendent of Education would annually distribute recognition awards to elementary and middle schools that show substantial improvement toward meeting standards of the Maryland School Performance Program. ED § 5-203.3. We do not view the creation of the State-funded and State-administered program as barring a county from establishing a voluntary, non-binding grant program that also rewards school performance, as long as the program does not infringe on the discretion of State or local educational authorities. If the two programs turn out to be incompatible in practice, those in charge of the school system can simply decline to participate in the county's program.
3. Advisory committees
Under ED § 4-111, "[e]ach county board shall establish at least one citizen advisory committee to advise the board and to facilitate its activities and programs in the public schools." This provision would bar a county from interfering with a school board's duty to establish an advisory committee. The commission contemplated for the grant program is not an "advisory committee," however, for it has nothing to do with advising the school board.
4. County appropriation requirements
It is rare for an enactment to raise a preemption issue when a local government proposes to spend more than is required for a mandated program. See Ramos v. Montgomery, 313 F. Supp. 1179
(S.D. Calif. 1970), aff'd, 400 U.S. 1003 (1971) (rejecting federal preemption challenge to state policy of making higher welfare payments to foster parents than birth parents).
The manner in which a county appropriates funds for the annual budget of the local board of education, however, is controlled entirely by State law. See 68 Opinions of the AttorneyGeneral 236, 238 (1983). The extremely complicated "maintenance of effort" provisions in ED § 5-202(b) reflect a legislative decision to preclude independent county decision-making about the requirements for "appropriat[ion of] local funds to the school operating budget . . . ." ED § 5-202(b)(3)(ii)2. See generally 76Opinions of the Attorney General ___ (1991) [Opinion No. 91-013 (March 6, 1991)]. In our view, State control extends to both mandatory appropriations to the school budget and discretionary amounts provided pursuant to ED § 5-103(c), which authorizes county governments to "provide funds that are more than the amount required by [maintenance of effort provisions] to support improved and additional programs."
This provision, as well as others related to county funding of a school system, may be said to reflect State preemption of a smaller field within the field of education — namely, fiscal relations between a county and a board of education. ED § 5-103(c), in particular, might well preempt a county's effort to create a parallel system of direct funding of individual schools, outside appropriations to the school board, linked to future "improved and additional programs" to be supported with those funds. In other words, a county may not condition eligibility for a grant on a school's agreement to pursue a particular program of instruction. If a county government, for example, thinks that more intensive teaching of phonics would improve reading performance, the county can seek to support its preferred instructional program through additional funds to the school board under ED § 5-103(c). The county may not attempt to control instructional content by means of grants to individual schools.
Yet ED § 5-103(c) does not, in our view, implicitly prohibit a different county grant program, one that offers individual schools monetary recognition for successful past performance without any attempt to specify program content, to interfere with the school system's prerogative to decide on programs, or to alter any aspect of the State-regulated budgetary process. The General Assembly itself recognizes that particular schools might receive grants apart from the ordinary funding process. "All property granted, conveyed, devised, or bequeathed for the use of a particular public school . . . [s]hall be held in trust for the benefit of the school . . . by the appropriate county board . . . ." ED § 4-113(a)(1).
As we see it, the objection to the Harford County proposal is one grounded in policy concerns, not preemption doctrine. If the county offers a substantial amount of extra money to schools that meet the county's performance standards, the school board will find itself under intense pressure to allow schools to pursue the money. Even if the county's standards are complementary to those set by school officials, the pursuit of the county's money might in practice result in a perceived shift of power away from the school board to the county.
Nevertheless, we cannot transform policy concerns into a legal veto. As long as a county performance grant program remains within the confines discussed above, it is not preempted by or in conflict with the budgetary provisions of the Education Article.
C. Defects in Bill 96-21
Although we conclude that a charter county may establish a grant program along the lines you have proposed, we do find legal defects in certain features of Bill 96-21. First, the proposal appears to require a member of the local board of education to serve on the Harford County Commission on School Performance. In our opinion, a local ordinance cannot require such service by a member of a board whose duties derive solely from State law. Second, the bill apparently requires funding proposals to be submitted by "school improvement teams" composed of teachers and parents, rather than any officer of the school. Because a grant application will make certain representations as to use of the funds by the school, and because a school has the absolute discretion to accept or reject a grant, any application for funding should be made expressly subject to the approval of school authorities. Third, a school seeking a grant must agree that use of the grant money will "help increase student performance and be consistent with [the] school improvement plan." This requirement suggests impermissible county involvement in future programmatic content, as distinct from an assessment of past performance.
 IV Conclusion
In summary, it is our opinion that a charter home rule county may establish a school performance incentive grant program as long as the program is a purely voluntary, non-contractual arrangement that rewards past performance and neither imposes future conditions on the operation of local schools nor interferes with the duties of State or local education authorities.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions Advice
 Robert A. Zarnoch Assistant Attorney General
[1] On the basis of this authority, a charter county presumably could establish a similar school performance program if the grant were made, for example, to a private, non-profit foundation, which in turn donated the funds to a particular school under criteria developed by the foundation. We need not consider this alternative, however, given our conclusion about direct county grants to schools that choose to seek the grants.
[2] Our conclusion is limited to the particular proposal in question, as construed by the County Attorney. This opinion does not address any other potential legislative action by a county relating to education.
[3] The boundaries of the preempted field were not drawn by the Court with precision. In 68 Opinions of the AttorneyGeneral 236, 237 (1983), Attorney General Sachs, after focusing on post-McCarthy cases, noted that "[i]t is by no means entirely clear whether the Court . . . intended to hold that local authority had been wholly preempted in every matter relating to education."
 *Page 27