*Montgomery County, Maryland v. Complete Lawn Care, Inc., et al.*, No. 1203, September Term, 2017. Opinion by Zarnoch, J.

**LOCAL GOVERNMENTS – PREEMPTION BY STATE LAW**

A Montgomery County ordinance restricting the use of certain pesticides throughout the County was not preempted in any of the three ways by which State law may preempt local law: (1) expressly, (2) by conflict, or (3) by implication. Express preemption occurs when the General Assembly prohibits legislation in a field by specific language in a statute. Conflict preemption occurs when a local law prohibits an activity which is intended to be permitted by State law, or permits an activity which is intended to be prohibited by State law. Implied preemption occurs when a local law deals with an area in which the Legislature has acted with such force that an intent to occupy the entire field must be implied.

**LOCAL GOVERNMENTS – CONFLICT PREMPTION – "FRUSTRATION OF PURPOSE"**

The Court of Appeals has not recognized federal "frustration of purpose"-type conflict preemption, nor applied the concept to resolve a conflict between State and local law. *County Council of Prince George's County v. Chaney Enters. Ltd. P'ship*, 454 Md. 514, 541 n. 19 (2017).

**STATUTORY CONSTRUCTION – PREEMPTION – "AMENDMENT REJECTION THEORY"**

The primary indicia of a legislative purpose to preempt an entire field by implication is the comprehensiveness with which the General Assembly has legislated that field. Among the secondary factors that can aid an implied preemption finding include the Amendment Rejection Theory of statutory construction, whereby legislative inaction impacts the interpretation of existing law. Under this theory, repeated rejection of legislation can "strongly suggest" that existing law does not embody those features. Here, in three successive sessions, the House of Delegates by floor vote rejected bills seeking to preempt county pesticide regulations.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1203

September Term, 2017

_____

MONTGOMERY COUNTY, MARYLAND

v.

COMPLETE LAWN CARE, INC., ET AL.

_____

Wright,
Beachley,
Zarnoch, Robert A.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Zarnoch, J.
_____

Filed:  May 2, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

From 1958-1962, Rachel Carson wrote *Silent Spring* from her home in Silver Spring.[1] Carson's examination of the health impacts of DDT and other pesticides galvanized the public, and the next decade saw Congress enact a broad range of statutes that are foundational to modern environmental law.[2] Montgomery County claims, in essence, that it is following in these footsteps, but we must determine whether it has done so consistently with State law.

In 2015, the Montgomery County Council passed an ordinance restricting the use of certain pesticides for cosmetic purposes throughout the County. The Supreme Court held in 1991 that the principal federal law governing pesticides permits such local legislation. *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991). Here, we are asked to decide whether the County's legislation is impliedly preempted or in conflict with Maryland's Agriculture Article. We conclude that the ordinance does not run afoul of State law. Because the Circuit Court for Montgomery County found otherwise, we

---

[1]    *See generally* Linda Lear, *Rachel Carson: Witness for Nature* (2009); William Souder, *On a Farther Shore: The Life and Legacy of Rachel Carson* (2013).

[2]    In the years after *Silent Spring*, Congress passed the Wilderness Act (1964), 16 U.S.C. § 1131 *et seq.*; the National Environmental Policy Act (signed into law January 1, 1970), 42 U.S.C. § 4321 *et seq*; the Clean Air Act Amendments of 1970, 84 Stat. 1676, as amended, 42 U.S.C. § 7401 *et seq.*; the Clean Water Act (1972), 86 Stat. 816, as amended, 33 U.S.C. § 1251 *et seq.*; the Coastal Zone Management Act (1972), 16 U.S.C. § 1451 *et seq.*; the Endangered Species Act (1973), 16 U.S.C. § 1531 *et seq.*; and the Safe Drinking Water Act (1974), 88 Stat. 1660, as amended, 42 U.S.C. § 300f *et seq.* Also during this period, Congress enacted legislation critical here: the 1972 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 – 136y.

Additionally, in 1970, President Richard Nixon established the Environmental Protection Agency through a reorganization plan transmitted to Congress. Reorganization Plan No. 3 of 1970, 84 Stat. 2086, reprinted in 5 U.S.C. app. at 698 (2012).

reverse both its injunction and declaratory judgment, and remand for an entry of a new declaratory judgment declaring the validity of the County ordinance.

To briefly summarize, we principally ground our decision on the following:

1) State law does not expressly preempt local government regulation of pesticides;

2) Following a 1985 published opinion of the Attorney General which said that State law did not impliedly preempt local pesticide regulation, 70 Md. Att'y Gen. Op. 161 (1985), and the U.S. Supreme Court's 1991 decision in *Mortier* that federal law also did not preempt local regulation, the pesticide industry unsuccessfully sought passage of preemptive legislation in 1992, 1993, and 1994. In full recognition of existing local pesticide ordinances, the members of the House of Delegates by floor vote rejected each of the bills that sought to preempt more stringent local regulation. This "strongly suggests" under the Amendment Rejection Theory that there was no legislative intent to authorize or recognize preemption. *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 304 (1993). No piece of legislation enacted subsequently undercuts that conclusion;

3) For decades, Maryland's Chesapeake and Atlantic Coastal Bays Critical Area Protection Program has authorized certain counties to regulate pesticides within the Critical Area without any record of chaos and confusion for multi-tiered regulation;

4) Despite the existence of a comprehensive federal statute desirous of "uniformity" of regulation, the Supreme Court said that federal law did not regulate pesticides "with[] regard to regional and local factors like climate, population, geography, and water supply" or oust local regulation with respect to such matters. *Mortier*, 501 U.S. at 614-15;

5) Probably less comprehensive than federal law, *see* 501 U.S. at 613, Maryland's pesticide statutes also reference uniformity with federal legislation. This is best regarded as an aspirational goal, rather than an obstacle to local legislation. The language of State law and enactments of the General Assembly would authorize broader regulation than federal law both generally and specifically;

6) There is no pervasive administrative enforcement of State pesticide statutes by the Maryland Department of Agriculture, which receives

2

federal funds to enforce federal law in Maryland and which has opposed tougher pesticide controls as "anti-agriculture"; and

7) Appellees' contentions and the circuit court's conclusion that the County ordinance frustrates the purposes of State law run counter to *County Council of Prince George's County v. Chaney Enters. Ltd. P'ship*, 454 Md. 514, 541 n. 19 (2017) (Frustration of purpose has never been applied to resolve a conflict between State and local law).

## PROCEDURAL AND REGULATORY BACKGROUND

In October 2015, the Montgomery County Council enacted Bill No. 52-14 ("the County ordinance"). Among its other provisions, the bill amended the Montgomery County Code to restrict certain pesticide use on private and County-owned property. Appellees[3] challenged the ordinance in the Circuit Court for Montgomery County, seeking a declaratory judgment that the bill was preempted by State law and a permanent injunction before the County ordinance was scheduled to take effect in January 2018. The County and Appellees waived discovery, stipulated as to the facts, and filed cross motions for summary judgment.

---

[3] Two groups of Appellees filed similar lawsuits that were ultimately consolidated in the circuit court. As described by the circuit court, the first group consisted of seven County residents (Michele Cropp, Patricia Eng, Jessica Fox, Hessie Harris, Conrad Hocking, Patricia Lynch, and Paul Vilk), six local businesses (Complete Lawn Care, Inc.; Green Gardens, Inc.; Integrated Plant Care, Inc.; Newsom Seed, Inc.; Rowlandscapes Corp.; and Super Lawns, Inc.), and a pesticide trade association (Responsible Industry for a Sound Environment, a Committee of Croplife America). The second group consisted of County residents (Anita Goodman and Stuart Cohen), a State-licensed pesticide applicator (Joel Owen), a landscape management company (Lancaster Landscapes, Inc.), a lawn care services company (Trugreen Limited Partnership), and "the world's largest marketer of branded consumer lawn and garden products" (Scotts Company, LLC). Here, we shall collectively refer to both groups as "Appellees."

In an August 2017 written opinion, the circuit court concluded that the County ordinance was preempted by State law, both by implication and by conflict: "[t]he County's Ordinance flouts decades of State primacy in ensuring safe and proper pesticide use, undermines the State's system of comprehensive and uniform product approval and regulation, and prohibits products and conduct that have been affirmatively approved and licensed by the State."[4] Accordingly, the circuit court granted Appellees' motion for summary judgment, issued a declaratory judgment that Bill No. 52-14 was unlawful and preempted by Maryland law, and ordered that the bill "as it regards the use of pesticides on private property, shall not take effect, and [Appellees] are entitled to permanent injunctive relief from the enforcement of these sections." The County's appeal followed.

To properly evaluate whether the General Assembly has intended to preempt local pesticide regulation, we must first consider how the County ordinance fits within the interweaving structures of federal and State law.

**Montgomery County's Pesticide Ordinance**

The County ordinance amended existing language in the Montgomery County Code[5] to require that retailers, among other requirements, make available to pesticide

---

[4]    The circuit court's opinion included other observations, such as: "Maryland counties have an insatiable appetite to tamper with existing state laws"; "The counties have tried to hijack a portion of the existing field of law [in various areas]"; and "The County Council can be reassured that the General Assembly has not rendered Montgomery County Neverland and its children 'lost' boys and girls." We will discuss other key portions of the circuit court decision later in this opinion.

[5]    As we will describe in further detail below, the County originally passed legislation containing notice requirements (and well as certain requirements concerning

(Continued…)

4

purchasers (1) notice signs, (2) federally-approved product labels, and (3) County-approved materials that explain both the potential dangers of pesticide use and the availability of alternative products. Montgomery County Code § 33B-3(a). The ordinance further amended existing language in the County Code to require that commercial pesticide applicators provide new customers with certain notice before and after pesticide application. Montgomery County Code § 33B-7(b). Additionally, the ordinance specified that applicators must place certain notice markers in areas near the site of application. Montgomery County Code §§ 33B-8—33B-9.

Most pertinent to Appellees' challenge here, the ordinance specifies that only "listed pesticide[s]"[6] may be applied to (1) lawns, (2) playgrounds, (3) mulched recreation areas, (4) children's facilities, or (5) the grounds of a children's facility when those areas are located on "County-owned property and private property"—which by definition would exclude public schools. Montgomery County Code § 33B-10(a). However, the law then specifies numerous exceptions to those use restrictions: a person may apply any pesticide that is registered with the Environmental Protection Agency

---

the retailing of pesticides) in 1985. This legislation was enjoined in 1986, after the U.S. District Court for the District of Maryland determined that it was preempted by federal law. *Md. Pest Control Ass'n v. Montgomery County, Md.*, 646 F. Supp. 109 (D. Md., 1986), *aff'd*, 822 F.2d 55 (1987). After the Supreme Court held in *Mortier* that FIFRA does not preempt local pesticide regulations, the District Court lifted its injunction in April 1992.

[6]     "Listed" pesticides are defined to mean pesticides that are recommended by the National Organic Standards Board (and thereafter published as the "National List"), or designated as "minimum risk pesticides" under FIFRA. Montgomery County Code § 33B-2.

("EPA")[7] to those same surfaces if applied to (1) control weeds, (2) control invasive species, (3) control disease vectors, (4) control biting or stinging insects or stinging plants, (5) control organisms that threaten the health of trees or shrubs, (6) maintain property as part of a public utility's efforts to comply with regulations, (7) control indoor pests, (8) control pests while engaged in agriculture, or (9) control a pest outbreak that poses an imminent threat to human health or prevent significant economic damage. Montgomery County Code § 33B-10(b). The law then stipulates that if a pesticide is applied pursuant to the exception concerning imminent threats to human health or preventing significant economic damage, the person applying the pesticide must inform the County of the application. Montgomery County Code § 33B-10(c).[8]

**Federal Regulatory Scheme**

Any County or State pesticide law is subject to applicable regulatory provisions of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 – 136y. Congress first enacted FIFRA in 1947, then comprehensively amended the law in 1972.

---

[7] Section 136a of FIFRA sets forth the process for registering pesticides with EPA. Generally, a pesticide may not be sold or distributed in the United States unless it is registered by EPA.

[8] Less pertinent to Appellees' challenge here, the County ordinance also requires the County Executive to implement a public outreach and education campaign, Montgomery County Code § 33B-11; restricts use of neonicotinoid pesticides on County-owned property, Montgomery County Code § 33B-12; requires the County to adopt an integrated pest management program for County-owned property, Montgomery County Code § 33B-13; and requires the County's Parks Department to implement a "pesticide-free parks program," Montgomery County Code § 33B-14.

6

*1947 FIFRA*

In 1947, Congress enacted FIFRA to replace 1910's Federal Insecticide Act. Public Law 104, Chapter 125. When FIFRA was originally enacted in 1947, it was similar to other early federal laws concerning adulterated products[9] in that it was "primarily a licensing and labeling statute." *Mortier*, 501 U.S. at 601.[10] 1947's FIFRA authorized the U.S. Department of Agriculture ("USDA") to issue pesticide licenses and registrations; the law then prohibited the distribution or sale of unregistered, misbranded, or mislabeled pesticides. Chapter 125, § 3. Even though 1947's FIFRA characterized pesticides as "economic poisons," it was not until 1964—after *Silent Spring* heightened the public's awareness that pesticides could, for instance, accumulate in human body tissues and breast milk—that Congress authorized USDA to take pesticides off the market by canceling their registrations. Alexandra B. Klass, *Bees, Trees, Preemption, and Nuisance: A New Path to Resolving Pesticide Land Use Disputes*, 32 ECOLOGY L. Q. 763, 771 n. 28 (2005); John Wargo, *Our Children's Toxic Legacy* 72 (1998). By 1970,

---

[9] The Pure Food and Drug Act of 1906, prompted by Upton Sinclair's *The Jungle*, prohibited mislabeled or adulterated food or drugs. *See* Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 STAN. L. REV. 1189, 1226-27 (1986). The 1910 Insecticide Act prohibited mislabeled pesticides, set purity standards, and added ingredient labeling requirements. Public Law 152, Chapter 191.

[10] *See also* Sanne H. Knudsen, *Regulating Cumulative Risk*, 101 MINN. L. REV. 2313, 2376 (2017). According to Knudsen, FIFRA, as originally enacted, was designed less to "address public health-related concerns" than "to ensure that pesticides actually killed pests" by "protect[ing] farmers and consumers against fraudulent products[.]" *Id.* (Internal quotation marks omitted).

7

when federal regulatory authority over pesticides was transferred from USDA to the newly-created EPA, USDA had issued nearly 60,000 pesticide registrations.

The 1947 law also stated that for the purpose of "securing uniformity of regulations," USDA was authorized "to cooperate with . . . the [appropriate] regulatory agency of any State, or any State, Territory, District, possession, *or any political subdivision thereof*, in carrying out the provisions of this Act," Chapter 125, § 13 (Emphasis added). To this day, when EPA develops policies that have federalism implications, the agency's internal policies require that EPA consult with ten organizations that are deemed to be representative of state *and local* officials. *See* EPA's Action Development Process, Guidance on Executive Order 13132: Federalism 45–46 (2008), available at https://www.govexec.com/pdfs/111908rb1.pdf.

### *1972 FIFRA Amendments*

Spurred by the response to *Silent Spring*, Congress transformed FIFRA, via 1972's amendments, from a licensing and labeling law into "a comprehensive regulatory statute." *Mortier*, 501 U.S. at 601. In doing so, Congress situated expanded regulatory authority over pesticides within the (recently-created) EPA. Currently, under FIFRA:

- Subject to exceptions, a pesticide must be registered with EPA to be sold or distributed in the United States. 7 U.S.C. § 136a(a).
- EPA shall register a pesticide if it determines, among other findings, that the pesticide "will perform its intended function without unreasonable adverse effects on the environment[.]" 7 U.S.C. § 136a(c)(5).
- Once EPA registers a pesticide (thereby approving the pesticide's labeling), it is unlawful "to use any registered pesticide in a manner inconsistent with its labeling." 7 U.S.C. § 136j(2)(G).
- Pesticides that pose heightened risks to the environment (including potential injury to applicators) are classified as "restricted use pesticides," and are subject to further restrictions. 7 U.S.C. § 136a(d)(1)(C).

8

- EPA must review pesticides' registrations every 15 years. 7 U.S.C. § 136a(g)(1).
- As a part of the reregistration review process, EPA issues a Reregistration Eligibility Decision (RED) document in which it can require, as a prerequisite for reregistration, the adoption of risk mitigation measures. Such measures can include: the reclassification of pesticides as restricted use; use-site restrictions; the implementation of buffer zones; mandatory good agricultural practices; fumigant management plans; and training programs. *See, e.g.*, U.S. Envtl. Prot. Agency, Reregistration Eligibility Decision (RED) Document for Methyldithiocarbamate Salts – Metam Sodium/Potassium and MITC at 8 (2008).
- EPA may cancel a pesticide's registration, or impose other use restrictions, if the pesticide "when used in accordance with widespread and commonly recognized practice, generally causes unreasonable adverse effects on the environment." 7 U.S.C. § 136d(b).

In addition to these provisions, § 136v(a) of FIFRA ("Authority of States") expressly allows a state to "regulate the sale or use of any federally registered pesticide[.]"[11] Also, FIFRA still provides that the EPA Administrator shall cooperate with "any appropriate agency of any State or any political subdivision thereof . . . in securing uniformity of regulations." 7 U.S.C. § 136t(b).

---

[11]  Under § 136v:

    (a) A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

    (b) Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

    (c) A State may provide registration for additional uses of federally registered pesticides formulated for distribution and use within that State to meet special local needs . . . [so long as the State is] capable of exercising adequate controls to assure that State registration under this section will be in accord with the purposes of this subchapter . . . .

***Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597 (1991)**

In *Mortier*, the Supreme Court determined that the express grant of authority to "States" in § 136v of FIFRA does not thereby preempt local regulation: "[the section] plainly authorizes the 'States' to regulate pesticides and just as plainly is silent with reference to local governments." *Id.* at 607. The Court reasoned: "the more plausible reading of FIFRA's authorization to the States leaves the allocation of regulatory authority to the 'absolute discretion' of the States themselves, including the option of leaving local regulation of pesticides in the hands of local authorities."[12] *Id.* at 608. Furthermore, the Court was unequivocal that—despite the comprehensiveness of the federal regulatory scheme established by the 1972 amendments—FIFRA did not intend to preempt the *field* of pesticide regulation. *Id.* at 613. Rather, the Supreme Court said that FIFRA "leaves substantial portions of the field vacant":

> FIFRA nowhere seeks to establish an affirmative permit scheme for the actual use of pesticides. It certainly does not equate registration and labeling requirements with a general approval to apply pesticides throughout the Nation without regard to regional and local factors like climate, population, geography, and water supply. Whatever else FIFRA

---

[12] Recently, during the 2018 Congressional debate over the five-year federal Farm Bill, there was an unsuccessful attempt to amend this provision of FIFRA and expressly preempt local pesticide regulations. Section 9101(b)(3) of the Farm Bill passed by the House of Representatives would have amended FIFRA to prohibit local regulations. However, the Senate counterpart contained no comparable provision, and the conference committee bill that was ultimately enacted (and signed into law) in December 2018 deleted the House language. 164 CONG. REC. H194 (daily ed. Dec. 10, 2018) ("Conference Report and Explanatory Material Statement on H.R. 2, Agricultural and Nutrition Act of 2018"), available at https://www.congress.gov/congressional-record/2018/12/10/house-section/article/H9823-2.

may supplant, it does not occupy the field of pesticide regulation in general or the area of local use permitting in particular. *Id*. at 613-14.

**Maryland's Regulatory Scheme**

Two subtitles within Title 5 of the State Agriculture Article pertain to pesticides: the Maryland Pesticide Registration and Labeling Law (Subtitle 1, §§ 5-101 – 5-114), and the Pesticide Applicator's Law (Subtitle 2, §§ 5-201 – 5-211).[13] These measures, largely enacted in 1957 and 1969, respectively, were later incorporated into the Agriculture Article in a 1973 Code Revision.[14] Laws of 1973, 1st Sp. Sess., Chapter 6.

### *The Maryland Pesticide Law of 1958*

The Maryland Pesticide Registration and Labeling Law that is now codified as Subtitle 1 of Title 5 of the Agriculture Article was enacted in 1957 (although it was titled "The Maryland Pesticide Law of 1958"). The 1957 law repealed and amended an earlier law from 1939 that had regulated the registration, sale, and handling of insecticides and fungicides.[15] Laws of 1957, Chapter 536. Like the earlier law from 1939, and like 1947's FIFRA, the Maryland Pesticide Law of 1958 regulated the distribution, sale, or transportation of adulterated or misbranded pesticides. An amendment to the Maryland

---

[13]    In 2016, §§ 5-2A-01 – 5-2A-05, dealing with neonicotinoid pesticides (a class of pesticides particularly harmful to bees) were added to Subtitle 2.

[14]    The Maryland Pesticide Registration and Labeling Law was originally added to Article 48 of the Code ("Inspections"), and the provisions of the Pesticide Applicator's Law were originally added to Article 66C (the Natural Resources article).

[15]    For instance, the 1939 law made it unlawful to distribute or sell misbranded insecticides, and imposed registration requirements on insecticides. Laws of 1939, Chapter 141.

Pesticide Law of 1958 added an uncodified provision to the law that provided that jurisdiction in those matters would be vested exclusively in the State Chemist:

> And be it further enacted, that jurisdiction in all matters pertaining to the distribution, sale and transportation of pesticides is by this act vested exclusively in the State Chemist and all acts and parts of acts inconsistent with this act are hereby expressly repealed. Sec. 3 of Chapter 536, Laws of 1957.

We additionally note that, at that time in 1957, the State Chemist was an officer appointed by the University of Maryland's Board of Regents; prior to the creation of the Maryland Department of Agriculture in 1972, the Board of Regents assumed an *ex officio* role as the State Board of Agriculture.

### *The Pesticide Applicator's Law*

The provisions regulating pesticide use that are currently codified as the Pesticide Applicator's Law, Subtitle 2 of Title 5 of the Agriculture Article, were first enacted in 1969. Laws of 1969, Chapter 593. The 1969 law originated as proposed legislation from a Governor's Commission on Pesticides; the Commission itself had been created by a joint resolution of the General Assembly in 1967. *Report to the Governor of Maryland and Maryland General Assembly from the Commission on Pesticides*, September 1, 1968 ("Commission Report"). The Commission Report, issued in September 1968, recommended adopting legislation to "[e]stablish a center for control of the use of pesticides in Maryland . . ." and to "[p]rovide certain essential definitions and guidelines for the [State Board of Agriculture]." *Commission Report* at 8-9. The law that was enacted by the General Assembly in 1969 largely mirrored the Commission's proposed legislation.

In 1985, the Attorney General's office issued an opinion as to whether State or federal law would preempt a proposed Montgomery County ordinance requiring lawn care businesses and pesticide dealers to warn the public of dangers concerning pesticides before and after application. 70 Md. Att'y Gen. Op. 161 (1985). The bulk of the opinion's analysis focused on why federal law would preempt such an ordinance (an analysis later superseded by *Mortier*), but on the State law issue, the opinion said: "existing State law [] does not preempt the County's authority to regulate pesticides[.]" *Id.* at 164 n. 5. The opinion reasoned: (1) "[a]bsent a prohibition by State or federal law, Montgomery County generally has authority to regulate the sale and use of pesticides"; (2) State law does not "oust[] local jurisdictions of authority to act" in the field of pesticide regulation; and (3) "State law neither contains express preemption language nor so comprehensively regulates in this area that a court would be compelled to find preemption by implication." *Id.* at 163-64. The opinion explained that, as a charter county, Montgomery County's express powers include the ability to "legislate for the benefit of the health, safety and general welfare of the local community." *Id.* at 163 (quoting *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel County*, 238 Md. 48, 57 (1978)). The opinion further noted that the Express Powers Act grants a charter county "broad authority to regulate conditions detrimental to health and to provide for the health and welfare of the County." *Id.* at 163 (Internal quotation marks omitted). The opinion then stated: "County regulation concerning the safe use of pesticides is plainly within these grants of authority." *Id.*

*Later Amendments*

In 1987, the Legislature amended the Pesticide Applicator's Law to require licensees to provide certain pesticide information to customers and to the Department of Agriculture and to post signs on treated property indicating that a pesticide had been applied. Laws of 1987, Chapters 301 and 302. The Legislature also conferred upon the Department the authority to impose civil penalties and seek injunctive relief for those violating the notice and posting requirements. The 1987 legislation also provided that "[f]or purposes of uniformity and in order to enter into cooperative agreements," the Agriculture Secretary was authorized to "adopt use classifications and other pertinent pesticide regulation provisions that are established by the U.S. Environmental Protection Agency[.]"

In 1998, the General Assembly required county boards of education to adopt integrated pest management systems for public schools and required public schools to provide certain notification and information regarding pesticide application. Laws of 1998, Chapter 461. The following session, the Legislature made some modifications to this statute, including requiring the Department of Agriculture to develop "uniform standards and criteria" for implementing integrated pest management for school grounds.[16] Laws of 1999, Chapter 327.

---

[16] The circuit court relied upon these statutes as preempting local legislation "specifically within the County's proposed field"—"the protection of children." These laws, the court said, "suggest[] that the State held the authority to legislate on this issue and that Maryland counties did not have the power to make rules in this field beforehand."

(Continued…)

14

Other enactments in 1999 and later were more singular in their operation. *See, e.g.*, Laws of 1992, Chapter 120 (increasing Department fines and penalties) and Laws of 1994, Chapter 550, (addressing certification and training requirements). But no enacted legislation clearly or expressly countered the Attorney General's opinion that local regulation was not preempted.

### *Legislative Rejection of Attempts to Preempt Local Pesticide Regulation*

The 1991 Supreme Court decision in *Mortier* drove the pesticide industry to seek enactment of State legislation preempting the local regulation of pesticides.

In the 1992 session of the Maryland General Assembly, HB 762/SB 549 was intended to completely preempt local regulation by vesting in the Secretary of Agriculture "sole authority over regulation of pesticide application and notification."[17] "[At] the Secretary's sole discretion," local governments were permitted to adopt more stringent requirements.

---

In our view, the circuit court was simply mistaken in its premise. The 1998 and 1999 enactments did not trump a county home rule power. They regulated in an area already preempted by the State—public education, *McCarthy v. Bd. of Educ. of Anne Arundel County*, 280 Md. 634, 651 (1977), and imposed duties on local boards of education, which are often considered State agencies, not agencies of county government. *See, e.g., Beka Indus., Inc. v. Worcester County Bd. of Educ.*, 419 Md. 194, 210 (2011); *but see Donlon v. Montgomery County Pub. Sch.*, 460 Md. 62, 96 (2018) ("[A] county board of education is not an entity of the State . . . or more specifically, a unit of the Executive Branch of State government" for purposes of whistleblower laws). Here, the 1998 and 1999 statutes are irrelevant to the interaction of State law and charter county home rule power. In any event, the County ordinance's restrictions on pesticide use only apply to "County-owned property and private property," which would not cover public schools. Montgomery County Code § 33B-10(a).

[17] Unless otherwise indicated, all legislative history data has been obtained from bill files.

While the Senate bill languished in committee, the House bill was amended to soften the opposition of home rule jurisdictions and environmental groups. Specifically, HB 762 was amended in committee to provide that "Any ordinance or regulation adopted by a local jurisdiction regulating pesticides in effect on October 1, 1992 may remain in effect as written."[18] As amended, the bill cleared committee and went to the floor, where it was voted down 72-52.[19] Opposition to the bill came from Delegates from charter home rule subdivisions (Anne Arundel, Baltimore, Howard, Montgomery, and Prince George's counties, and Baltimore City).

1993 brought round two, where the push began on the Senate side. SB 429 would have vested the Secretary of Agriculture with "general authority over the regulation of pesticides." A local jurisdiction could enact a tougher regulation if it ran the proposal through a three-member review board, consisting of the Secretaries of Agriculture, Environment, and Natural Resources. As introduced, the bill grandfathered existing local ordinances, but not subsequent amendments. In committee, the grandfather clause was amended to provide that "[T]his Act does not affect the authority of a local jurisdiction

---

[18] The Floor Report for HB 762 stated:

Q: What local ordinances would be grandfathered?
A: Currently, local ordinances in Prince George's and Montgomery counties are under federal injunction. We expect the injunction to be lifted within a few months. The town of Manchester, in Carroll County, has an ordinance in effect. Howard County is currently developing an ordinance, which may be in effect by October 1, 1992.

[19] As an indication that the legislation was controversial, 17 Delegates chose not to vote.

16

that has a local ordinance regulating pesticides as well as public notification regarding the use of pesticides in effect as of October 1, 1993 to adopt and implement an ordinance that is more stringent than State regulation." As amended, the bill passed the Senate by an overwhelming majority (42-5) and was sent to the House.[20] Once again, the bill was approved by the House Environmental Matters Committee, but was then defeated on the House floor by a 70-65 vote.[21] Once again, the opposition to the bill came from Delegates from charter home rule jurisdictions.

The final knockdown occurred in 1994. HB 948, as introduced, contained some elements of previous bills, including the grandfather clause from the 1993 legislation. The review board was expanded to five Cabinet secretaries. Most significantly, the bill was amended to specifically exempt Montgomery County from the review process entirely. The bill was approved by the House Committee and again reached the floor. Although the vote was closer than in previous years, the bill failed to win the necessary constitutional majority of 71 by three votes. A motion for reconsideration failed by a single vote. The same coalition of charter subdivision legislators was responsible for the defeat.[22]

---

[20] The passage of SB 429 in the Senate adds nothing to Appellees' argument for implied preemption. If anything, Senate action would have recognized and grandfathered certain County authority over pesticides and emphasized the need for express preemption legislation to diminish county authority. In 1992 and 1994, the Senate cross-files to the failed House legislation did not clear committee.

[21] It is rare for committee chairs to lose such a vote on the floor. A motion to recommit was made, but was tabled by a subsequent motion.

[22] A cross-filed Senate bill died in committee.

*Current Code: The Maryland Pesticide Registration and Labeling Law*

The Maryland Pesticide Registration and Labeling Law is currently codified as Subtitle 1 of Title 5 of the Agriculture Article; its essential provisions remain consistent from when it was first enacted in 1957. The law requires distributors to register pesticides with the Agriculture Secretary before distributing them in the State. § 5-105(a). Before a pesticide may be registered, the pesticide must comply with federal pesticide laws and regulations. § 5-105(h). Subject to certain exceptions, any pesticide that is distributed, sold, offered for sale, delivered for transportation, or transported in the State must be properly packaged and labeled, § 5-106, and a person may not distribute, sell, or transport any unregistered or misbranded pesticide. § 5-109.  The Agriculture Secretary may suspend or cancel the registration of any pesticide that is improperly labeled or otherwise does not comply with the law. § 5-107. The statute provides that "[t]he Secretary may cooperate with and enter into agreements with any other agency of the State, any other state, the United States, or with the Association of American Pesticide Control Officials, Inc. to carry out the provisions of this subtitle and to secure uniform rules and regulations." § 5-102(b). Additionally, because "[u]niform pesticide requirements between the several states and the federal government are desirable to avoid confusion that endangers the public health and that results from diverse requirements," the Secretary may adopt EPA's rules and regulations if they "are applicable to and conform with the primary standards established by this subtitle." § 5-104(c).

18

*Current Code: The Pesticide Applicator's Law*

The Pesticide Applicator's Law is currently codified as Subtitle 2 of Title 5 of the Agriculture Article. The law states that, among other duties, the Agriculture Secretary shall: "[a]dopt rules and regulations governing the storage, sale, distribution, exchange, use, and disposal of any pesticide and its container;" § 5-204(1); "[p]rescribe, when necessary, the time and conditions under which a pesticide may be sold, distributed, exchanged, or used in different areas of the State;" § 5-204(2); "[p]rovide, if necessary, that extremely hazardous pesticides may be sold, distributed, exchanged, or applied only when special permission first is obtained from the Secretary;" § 5-204(3); and "[d]efine the formulations and establish the conditions and appropriate areas for application of any pesticide;" § 5-204(4). The law sets forth that "[a] person may not use, apply, or recommend use of a pesticide other than as specified by the label[,]" and "[a] person may not use, apply, or recommend use of a pesticide in a manner other than as specified by [the law] or rules and regulations adopted under it." § 5-210. The Agriculture Secretary must set certification requirements for applicators, § 5-206(a), and may only issue licenses to applicants who meet those requirements. § 5-206(b). At various times, licensees must provide a customer with "[p]ertinent safety information, as determined by the Department," § 5-208(a)(5), and the statute requires notice posting when pesticides are commercially applied to a lawn. § 5-208(c). Additionally, the statute states that, "[f]or purposes of uniformity and in order to enter into cooperative agreements, [the Secretary shall] adopt use classifications and other pertinent pesticide regulation provisions that are established by the U.S. Environmental Protection Agency[.]" § 5-204(13).

19

**DISCUSSION**

There are three ways in which State law may preempt local law: (1) expressly, (2) by conflict, or (3) by implication. *Chaney*, 454 Md. at 540-41 (citing *Md. Reclamation Assocs., Inc. v. Harford County*, 414 Md. 1, 36 (2010)). The circuit court found, and Appellees assert, that the County's law is preempted both by conflict and by implication. We review *de novo* the circuit court's issuance of a declaratory judgment after granting a motion for summary judgment. *Dep't of Pub. Safety & Corr. Servs. v. Doe*, 439 Md. 201, 219 (2014).

In addition to these two central contentions, we examine whether aspects of the County ordinance have been expressly preempted by an uncodified amendment to the Maryland Pesticide Law of 1958 that does not appear to have ever been officially repealed.

**I.    The County Ordinance's Sale and Distribution Requirements Are Not Expressly Preempted.**

"Express preemption occurs when the General Assembly prohibits local legislation in a field by specific language in a statute." *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 512 n. 6 (2004). As described above, the Maryland Pesticide Registration and Labeling Law, currently codified as Subtitle 1 of Title 5 of the Agriculture Article, originated as the Maryland Pesticide Law of 1958. Laws of 1957, Chapter 536. And as mentioned, an amendment to the Maryland Pesticide Law of 1958 added an uncodified provision to the law that provided that jurisdiction in all matters

pertaining to the distribution, sale, and transportation of pesticides would be vested exclusively in the State Chemist:

> And be it further enacted, that jurisdiction in all matters pertaining to the distribution, sale and transportation of pesticides is by this act vested exclusively in the State Chemist and all acts and parts of acts inconsistent with this act are hereby expressly repealed. Laws of 1957, Chapter 536, Sec. 3.

The County's brief acknowledges this uncodified provision, and even goes so far as to call it a "preemption clause," but then claims that the clause was eliminated by the 1973 Code revision that created the new Agriculture Article. We disagree with the County on both counts: the provision does not, in fact, appear to have ever been expressly repealed; nevertheless, it is not preemptive of the County's authority to impose local pesticide requirements.

The County cites a Revisor's Note to the 1973 Session Law that created the Agriculture Article for the proposition that the 1973 Code revision repealed the uncodified provision. The Revisor's Note in question stated: "All other present references to the State Chemist *in this subtitle* are proposed for deletion . . . ." Laws of 1973, Chapter 6, at 1571 (Emphasis added). However, the phrase "in this subtitle" would only refer to *codified* provisions of the Code; by their very nature, uncodified provisions would not be a part of the codified "subtitle." Thus, the uncodified provision would not have been deleted by this language and, technically, remains law.[23]

---

[23] This "lost law" from 1957 illustrates how it is particularly unwise to enact a substantive provision in a law's uncodified language.

Nevertheless, we do not read the uncodified provision as a true preemptive clause that was meant to confine local regulation in the face of State authority. Rather, in context, the uncodified provision appears more likely to have been intended as a realignment of duties *among* State officials. The Maryland Pesticide Law of 1958 repealed and amended an earlier law from 1939 that had regulated the registration, sale, and handling of insecticides and fungicides. The 1939 law had placed enforcement and administrative authority over pesticide registrations in the State Board of Agriculture, and authorized the State Board of Agriculture to promulgate such rules and regulations as may have been necessary for the law's administration. Laws of 1939, Chapter 141, § 105D. The Maryland Pesticide Law of 1958, however, specified that those responsibilities would now be vested in the State Chemist, an officer appointed by the University of Maryland's Board of Regents acting *ex officio* as the State Board of Agriculture. Laws of 1957, Chapter 536, § 134. Elsewhere, the 1957 law stated that "[a]ll authority vested in the State Chemist . . . may with like force and effect be executed by such employees of the Board of Agriculture as the State Chemist may from time to time designate for said purpose." Laws of 1957, Chapter 536, §140C. Given these somewhat overlapping duties between the State Board of Agriculture and the State Chemist it appointed, the uncodified provision was likely intended to clarify the apportionment of duties between the State units. And as such, when the Code was revised in 1973, and the position of State Chemist was transferred to a subordinate position within the new Department of Agriculture, it would at that time have become clear that the express duties of the State Chemist were now duties within the Department's

hierarchy of duties. Indeed, were the uncodified provision intended to be a true preemption clause with respect to the authority of local governments—and never repealed—it would make no sense to vest exclusive State jurisdiction in a subordinate office within the Agriculture Department.

## II. The County Ordinance is Not Preempted by Conflict.

The crux of conflict preemption is that "a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted." *Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County*, 307 Md. 307, 335 (1986) (Emphasis in original) (quoting *City of Baltimore v. Sitnick & Firey*, 254 Md. 303, 317 (1969)); *see also Chaney*, 454 Md. at 541 n. 19 ("Conflict preemption occurs when a local law 'prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law.'") (quoting *Talbot County v. Skipper*, 329 Md. 481, 487 n. 4 (1993)). Notably, although the circuit court found conflict preemption in part based on its determination that the County ordinance would frustrate the State's purpose of seeking uniform pesticide regulations, the Court of Appeals "has not recognized frustration of purpose-type conflict preemption." *Chaney*, 454 Md. at 541 n. 19. Indeed, the Court of Appeals has emphasized that it has "rejected the application" of "federal 'frustration of purpose'

23

preemption to a local. . . ordinance" because "our appellate courts ha[ve] never applied it to resolve a conflict between state and local law."[24] *Id.*

Here, Appellees argue that the sort of express authorization that would compel a finding of conflict preemption is contained in the Department of Agriculture's regulations. For instance, the Department's regulations require that when using pesticides, a person shall "[u]se or recommend only those pesticides which are registered with the Department[.]" COMAR 15.05.01.02(B)(1). The Department additionally specifies that "[a] person may not use a restricted use pesticide unless that person is a certified applicator or is a person working under the supervision of a certified applicator." COMAR 15.05.01.02(C).

We agree with the County, however, that this language is less an express authorization of use than it is a *restriction* of permitted use. *See, e.g.*, 73 Md. Att'y Gen. Op. 12, 18 (1988) ("Every registered pesticide has a federally approved label that defines and *restricts* its use.") (Emphasis added). The Department's regulations do not provide *carte blanche* to use registered pesticides once they have been registered by EPA and the State (and, in the case of a restricted use pesticide, so long as the individual is

---

[24]     Even if Maryland did recognize frustration of purpose preemption, it would be overly formalistic to conclude that the "purpose" of the State's pesticide laws is to seek uniform regulations, or to give the Agriculture Department a premier bureaucratic role—rather than to promote agriculture, the public health, and the environment. *See* 70 Md. Att'y Gen. Op. 161, 164 n. 5 (1985) ("As with the Montgomery County ordinance, the safe use of pesticides is the objective of the State law"). Because State pesticide provisions appear to serve multiple purposes, there is room for local regulation such as the Montgomery County ordinance, which is aimed exclusively at protecting public health.

appropriately certified). The full text of the Department's regulations goes on to require that pesticide applicators incorporate additional best practices to promote human health and the environment: in the same COMAR chapter, for instance, the Department requires individuals to "[o]bserve all precautions in the handling, use, storage, and disposal of pesticides" so that "humans[] do not suffer injury" and "[u]nreasonable adverse effects on the environment do not occur or are minimized[.]" COMAR 15.05.01.02(B)(3). The Department also requires certified applicators to "[m]ake use of scientific training, practical experience, and commonly recognized pesticide industry guidelines or recommendations" when treating for pests, and to "[c]onsider recommended alternative pest control measures, such as mechanical, cultural, physical, biological, or chemical control[.]" COMAR 15.05.01.03(C). All this language would be completely extraneous surplusage if mere compliance with a registered pesticide's label gave individuals an unfettered green light to use the pesticide throughout Maryland as directed by the label.[25] Accordingly, the Department's regulations requiring compliance with labels are better characterized as setting a floor, above which the County may provide for further health and safety restrictions. *See Mayor & City Council of Balt. v. Hart.,* 395 Md. 394, 396-97, 409 (2006) (When a statute dictated statewide minimum safe driving conduct for emergency vehicles, and a Baltimore Police Department order provided a more stringent

---

[25] Moreover, under FIFRA, EPA approves all pesticide labels, and the states are generally prohibited from imposing "any requirements for labeling and packaging in addition to or different from those required [by EPA]," 7 U.S.C. § 136v(b). As such, if the General Assembly intended for a pesticide label to provide the unfettered right to use registered pesticides in Maryland, there would be little for the Agriculture Department to do other than approve or disapprove pesticides already registered by EPA.

standard for its own emergency vehicles, the Court of Appeals determined that "[t]he function of [the statute] is, presumably, to help facilitate the safe operation of emergency vehicles. [The BPD order] simply provides for, arguably, a higher safety standard."); *see also* M. Peter Moser, *County Home Rule—Sharing the State's Legislative Power with Maryland Counties*, 28 MD. L. REV. 327, 350 n. 79 (1968) (discussing Court of Appeals decisions that upheld "additional limitations" imposed by local regulations, "on the basis that the state and [locality] might act concurrently on the subject matter."). Moreover, despite Appellees' characterization of the County's use restrictions as a total "ban," the County ordinance "is less restrictive than a categorical ban[.]" *Md. Reclamation Assocs.*, 414 Md. at 44. The County ordinance does not restrict the use of "listed" pesticides; does not affect who may be certified or hired as a commercial applicator; exempts agricultural use; and allows using any pesticide registered with EPA under a rather expansive set of circumstances: to control weeds, invasive species, disease vectors, biting or stinging insects or stinging plants, indoor pests, or a pest outbreak that poses an imminent threat to human health.

We are also mindful that pursuant to the Chesapeake and Atlantic Coastal Bays Critical Area Protection Program, Md. Code (2012 Repl. Vol., 2018 Cum. Supp.), Natural Resources Article, §§ 8-1801—8-1817, the State requires local jurisdictions within the Critical Area to develop agricultural programs that "[a]ssure that best management practices for the control of nutrients, animal wastes, *pesticides*, and sediment runoff be used to protect the productivity of the land base and enhance water quality." COMAR 27.01.06.02(E) (Emphasis added). This provision goes on to state that

26

such practices "shall minimize contamination of surface and ground water and, further, shall minimize adverse effects on plant, fish, and wildlife resources."[26] *Id.* It would be anomalous for the State to require each of the jurisdictions within the Chesapeake Bay Critical Area (16 counties and Baltimore City) to actively develop pesticide control practices for the sake of protecting water quality and wildlife if the Agriculture Article conflicted with the ability of County governments to enact such rules. Furthermore, local policies that minimize pesticide contamination would only aid the State's water quality goals under the Clean Water Act.[27] *See, e.g.,* Md. Dep't of Env't, NPDES MS4 Permit [a Clean Water Act discharge permit] for Montgomery County at 6 (2010) ("The County shall continue to implement a program to reduce pollutants associated with road maintenance activities. The road maintenance program shall include . . . [r]educing the use of pesticides, herbicides, fertilizers, and other pollutants associated with roadside vegetation management through increased use of integrated pest management . . .").

## III. The County Ordinance is Not Preempted by Implication.

Implied preemption concerns whether a local law "deals with an area in which the State Legislature has acted with such force that an intent by the State to occupy the entire

---

[26] Elsewhere, for example, the Critical Area Program regulations set forth that, in the context of development, "[l]ocal jurisdictions may preclude additional development activities that they consider detrimental to water quality or fish, wildlife, or plant habitats within their jurisdictions." COMAR 27.01.02.02(F)(2).

[27] When setting water quality standards for the State pursuant to the Clean Water Act, the Department of the Environment is authorized to adopt "[r]equirements for the sale, offer, use, or storage of pesticides and other substances that the Department finds to constitute water pollution hazards." Md. Code (2014 Repl. Vol., 2018 Cum. Supp.), Environment Article, § 9-314(b)(4).

field must be implied." *Chaney*, 454 Md. at 541 (quoting *Skipper*, 329 Md. at 488). In determining whether "the General Assembly [has] occup[ied] a particular field so extensively as to preclude local legislation," *Altadis U.S.A., Inc. v. Prince George's County, Maryland*, 431 Md. 307, 311 (2013), the "primary indicia of a legislative purpose to pre-empt an entire field of law is the comprehensiveness with which the General Assembly has legislated that field." *Chaney*, 454 Md. at 541 (quoting *Allied Vending,* 332 Md. at 299). The Court of Appeals has emphasized that "[t]here is no particular formula for determining whether the General Assembly intended to preempt an entire area," *Skipper*, 329 Md. at 488. Secondary factors that could aid in an implied preemption finding include whether a "multi-tiered regulatory process . . . would invite chaos and confusion," *Altadis*, 431 Md. at 315 (quoting *Allied Vending*, 332 Md. at 303), and whether the General Assembly has exclusively regulated in an area "in which no local control has traditionally been allowed," *Altadis*, 431 Md. at 315 (quoting *Allied Vending*, 332 Md. at 302). Other secondary factors include: "whether local laws existed prior to the enactment of the state laws governing the same subject matter"; "whether the state laws provide for pervasive administrative regulation"; "whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances"; "whether a state agency responsible for administering and enforcing the state law has recognized local authority to act in the field"; and "whether the particular aspect of the field sought to be regulated by the local government has been addressed by the state legislation." *Allied Vending*, 332 Md. at 299 (Internal citations omitted).

28

The secondary *Allied Vending* factors, if not ignored entirely, have not risen in subsequent cases to a litmus test for implied preemption. *See, e.g., Chaney*, 454 Md. at 541-45. Thus, the failure to meet some or all of the secondary *Allied Vending* factors does not necessarily control the outcome of an implied preemption challenge.

Another *Allied Vending* preemption consideration deemed controlling in that case was application of the Amendment Rejection Theory of statutory construction. In that case, the Court relied on repeated legislative rejection of bills that would have authorized local regulation of cigarette vending machines to find that such failures "strongly suggest[] that there was no intent to allow local governments to enact different [] requirements." 332 Md. at 304 (quoting *Skipper*, 329 Md. at 493).

An evaluation of these considerations leads us to conclude that the General Assembly has not intended to preempt the entire field of pesticide regulation.

### A. The Comprehensiveness and Course of Legislative Activity

Appellees claim that the State has regulated so extensively and comprehensively as to preclude any local regulation. Appellees point to the Pesticide Applicator's Law, codified as Subtitle 2 of Title 5 of the Agriculture Article, which states that, among other duties, the (now) Agriculture Secretary shall: "[a]dopt rules and regulations governing the storage, sale, distribution, exchange, use, and disposal of any pesticide and its container;" § 5-204(1); "[p]rescribe, when necessary, the time and conditions under which a pesticide may be sold, distributed, exchanged, or used in different areas of the State;" § 5-204(2); "[p]rovide, if necessary, that extremely hazardous pesticides may be sold, distributed, exchanged, or applied only when special permission first is obtained from the Secretary;"

29

§ 5-204(3); and "[d]efine the formulations and establish the conditions and appropriate areas for application of any pesticide;" § 5-204(4).

On their face, these provisions are less comprehensive than the non-preemptive features of FIFRA. Furthermore, we note that at the time these provisions were enacted, in 1969, the Maryland Department of Agriculture did not yet exist. Instead, the regulatory authority conveyed by the language just described was given to the State Board of Agriculture—a body that since 1908 had officially consisted of the University of Maryland's Board of Regents acting in an additional capacity.[28] We do not believe that the General Assembly of 1969 intended the University's Board of Regents to have such expertise in the field of pesticide regulation as to preclude any regulation by local governments. For perspective, in 1966 the USDA employed *one* toxicologist, despite being the federal agency in charge of administering FIFRA at that time. John Wargo, *Our Children's Toxic Legacy* 76 (1998).

We are also especially mindful that the Department of Agriculture's regulatory authority was already present within the Pesticide Applicator's Law when the Attorney General's office concluded, closer to the time of enactment, in 1985, that "State law . . . [does not] so comprehensively regulate[] in this area that a court would be compelled to

---

[28] Laws of 1908, Chapter 161 (declaring that "a State Board of Agriculture for Maryland is hereby created[]" and "the board of trustees of the Maryland Agricultural [C]ollege as constituted from time to time shall be ex officio the Maryland State Board of Agriculture."). Though not officially constituted until 1908, the (then) College's Board had been taking on the dual capacity since the 1880's, when the General Assembly enacted the State Fertilizer Law of 1886: "For lack of any other established agency, the legislature assigned the fertilizer inspector to work under the direction of the College president." George H. Callcott, *A History of the University of Maryland* 189 (1966).

find preemption by implication." 70 Md. Att'y Gen. Op. 161, 164 n. 5 (1985). Such an understanding that *State* law did not preempt local regulations is gleaned from the General Assembly's consideration of pesticide legislation in 1987. That year, the General Assembly revised the Pesticide Applicator's Law to require commercial applicators to post notice signs on lawns for 48 hours following the application of pesticides. Laws of 1987, Chapters 301 and 302. The State legislation arose after Montgomery County and Prince George's County each passed legislation requiring notice in connection with pesticide application. In a consolidated lawsuit, the U.S. District Court for the District of Maryland held in 1986 that *FIFRA* preempted both counties' laws. *Md. Pest Control Ass'n v. Montgomery County, Maryland.*, 646 F. Supp. 109 (D.Md. 1986), *aff'd*, 822 F.2d 55 (1987). The counties' legislation, along with pressure from environmental activists, spurred the General Assembly to pass the statewide notice requirements via an Agriculture Department Bill.[29]

---

[29]     In April 2015, the Attorney General's legislative office wrote an advice letter to Delegate Kirill Reznik about whether the County legislation at issue here might be preempted by State law. The advice letter did not unequivocally conclude either way, stating: "[w]hile the matter is not completely clear, it is my view that the general ban on application of non-essential pesticides may well be preempted, but that other parts most likely would not be." We mention the advice letter here because it stated that, in its view, the 1985 Attorney General's opinion no longer "settle[s] the issue" of preemption because, in part, "Maryland law has changed significantly" since 1985—pointing to this 1987 legislation. The advice letter did not discuss the rejection of preemptive legislation in the 1992, 1993, and 1994 legislative sessions.

We also note that the April 2015 advice letter's analysis went on to cite out-of-state cases that found preemption of local pesticide regulation. Of those, some are distinguishable because the state laws in question either contained express preemption clauses (unlike Maryland), or because the relevant state's preemption doctrine differs noticeably from Maryland's. *See Village of Lacona v. State, Dep't of Agric. and Mkts.*,

(Continued…)

31

858 N.Y.S.2d 833 (2008) (New York vests exclusive jurisdiction in a state agency); *Ames v. Smoot*, 471 N.Y.S.2d 128 (1983) (same); *Long Island Pest Control Ass'n v. Town of Huntington*, 341 N.Y.S.2d 93 (1973) (same); *Minn. Agric. Aircraft Ass'n v. Township of Mantrap*, 498 N.W.2d 40 (Minn. App. 1993) (Minnesota's law has an express preemption clause); *Town of Wendell v. Attorney General*, 476 N.E.2d 585 (Mass. 1985) (Massachusetts recognizes "frustration of purpose" preemption). In certain other cases cited by the advice letter, courts had found preemption based either on a determination that the plain text of a state code clearly evinced a comprehensive regulatory scheme, or the paramount goal of uniformity, or both. *See Syngenta Seeds, Inc. v. County of Kauai*, 842 F.3d 669 (9th Cir. 2016); *Pesticide Pub. Policy Found. v. Village of Wauconda*, 622 F. Supp. 423 (N.D. Ill. 1985); *Town of Salisbury v. New England Power Co.*, 437 A.2d 281 (N.H. 1981). For the reasons we describe in greater detail elsewhere in this opinion, we believe that an analysis of the Maryland statutes and caselaw dictates a different conclusion. As the April 2015 advice letter itself acknowledged: "The [out-of-state] cases are not as helpful as they could be, [] because different states apply different tests as to preemption, and, of course, the types of regulation that have been attempted at the local level vary greatly."

We also note that the Attorney General's office then wrote an advice letter in May 2015 to Delegate Kumar Barve about the County legislation. Though the April and May 2015 advice letters are largely the same, the May 2015 advice letter did not mention the 1987 statute. Instead, the May 2015 advice letter stated that the 1985 Attorney General's Opinion no longer "settle[s] the issue" of preemption because "[t]he [1985] Opinion did not [] address the ability of a County to ban or restrict the use of specific pesticides." Once again, the advice letter did not analyze the impact of repeated failed legislation that sought to negate the County's authority to enact an ordinance stricter than State law.

The circuit court decision did not mention the published 1985 Attorney General's opinion which concluded that there was no State preemption. Rather, it pointed to the unpublished 2015 advice letters for support. We note that unpublished advice letters do not ordinarily overrule published opinions of the Attorney General. These opinions "are entitled to careful consideration" by the courts, *Brown v. County Comm'rs of Carroll County*, 338 Md. 286, 296 (1995) (Internal quotation marks omitted). The Legislature is "presumed to [know]" of the Attorney General's interpretation, *Benco Vending, Inc., v. Comptroller of Treasury*, 244 Md. 377, 383 (1966), which could place a "gloss" on subsequent legislation. *Id.  See also State ex rel. Attorney General v. Burning Tree Club, Inc.*, 301 Md. 9, 34 (1984) ("[M]embers of the General Assembly rely upon the advice of the Attorney General as to whether a proposed enactment is valid.").

In our view, the circuit court erred in not considering the Attorney General's 1985 opinion, which served as pre-enactment legislative history for subsequent enactments on pesticides and which cannot simply be wished away in the preemption analysis.

A review of this legislation's bill file conveys that, in the period in 1987 in which the legislation was considered—that is to say, after the District Court decision, but before the Supreme Court's decision in *Mortier*—the general understanding was that *federal* law preempted County regulation. Given this understanding pre-*Mortier* that federal law already preempted local regulation, the General Assembly may very well have not concerned itself with the question of whether State law also preempted local regulation. 70% of the Delegates who were in the House in 1987 were still in the House in 1992 when, after *Mortier*, the bill specifically designed to preempt local regulation was voted down on the House floor. *Compare Maryland Manual* (1987-1988) *with Maryland Manual* (1991-1992). It would be curious for these same Delegates to expressly reject preemption in 1992 (and again in 1993 and 1994) if they had earlier thought they were already comprehensively regulating the field. Indeed, any consideration of whether State law preempted local regulation (such as that passed by Montgomery County and Prince George's County) is largely absent from the materials contained within the 1987 legislation's bill file.[30] Even Montgomery County supported the 1987 legislation, on the

---

[30] A research analysis prepared at that time by the Legislative Reference-Research Division for the House Environmental Matters Committee stated (incorrectly) that the Attorney General's 1985 opinion concluded that Montgomery County's authority "was preempted by either State or federal law." The bill file also contains a letter that was submitted (before the federal court decision) by the Montgomery County Government's Office of State Affairs. The County expressed concern that a bill from the 1985 Session (that did not pass) would have changed the definition of "labeling" in the Pesticide Applicator's Law in such a way as to "preempt[] local authority and is so broad that it could exclude Montgomery County's sign posting and information brochure requirements." (The proposed language from 1985 that caused Montgomery County

(Continued…)

33

grounds that (1) it resembled the County's bill, and (2) as the County understood it at that point (post-District Court, but pre-*Mortier*), "FIFRA does not preempt States from requiring pesticide application signage."

A very recent example of the General Assembly acquiescing to the views of local pesticide regulators occurred in 2016, when Montgomery County opposed amended language in legislation, HB211/SB198, that became the Pollinator Protection Act. Laws of 2016, Chapters 661 and 662. At one point, the Senate amended the bill to require the Agriculture Department to make recommendations (following an EPA risk assessment) for any changes to the State pesticide laws that would be "necessary to ensure State laws and regulations *are consistent with* the U.S. Environmental Protection Agency recommendations." (Emphasis added). The amendment's "consistency" language raised the concern of Montgomery County in connection with the County ordinance. The Pollinator Protection Act's bill file contains a letter to Montgomery County Delegates from (then) Councilman Marc Elrich stating that the Senate amendment "could create problems for our (and other) counties to enact legislation that we think is in the best interest of our residents." Additionally, an email to Montgomery County Delegates and Senators from the office of Councilman George Leventhal noted that the Montgomery County Council voted unanimously to oppose the Senate amendment's language. Notably, the legislation that was ultimately enacted by both chambers was consistent with the preferences of the Montgomery County delegation. The General Assembly stripped

concern at the time is currently how the Pesticide Applicator's Law now defines "labeling.")

34

the "consistent with [EPA recommendations]" language, and amended the legislation to instead read: "the Department shall review the State's pesticide laws and regulations and make recommendations for any changes necessary to ensure State laws and regulations are protective of pollinators, *taking into account* the U.S. Environmental Protection Agency recommendations." (Emphasis added).

### B.     *Application of the Amendment Rejection Theory*

The County has argued that the Amendment Rejection Theory supports the conclusion that the ordinance is not impliedly preempted. The Appellees disagree. The circuit court did not address the issue. In our opinion, the circuit court erred in not giving strong weight to the almost-unheard-of rejection by the House of Delegates in three successive sessions of legislation seeking to preempt stricter local regulation of pesticides.

The Amendment Rejection Theory is generally a type of post-enactment legislative history, where the Legislature's inaction on a bill impacts the interpretation of existing law. When embraced by a court, this doctrine equates inaction on a proposed amendment as a rejection of its alternative interpretation. *See* William N. Eskridge, Jr., *Interpreting Legislative Inaction*, 87 MICH. L. REV. 67 (1988).

Maryland courts have applied amendment rejection in three different contexts: (1) ordinary statutory construction, *see, e.g., State v. Bell*, 351 Md. 709, 721 (1998); (2) judicial determination of whether to alter the common law*, see Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 690, 693-94 (2013); and (3) resolution of whether State law preempts local regulation, *see, e.g., Allied Vending*, 332 Md. at 304.

Most amendment rejection cases have involved the first category, where it is sometimes a tool in statutory construction. There are numerous cases on both sides of the ledger. *Compare Goldstein v. State*, 339 Md. 563, 570 (1995) (Courts are reluctant to infer legislative intent from legislative inaction where there are several possible reasons for defeat) *with State v. Bell*, 351 Md. at 721 ("Although we have never held that the amendment-rejection theory is a completely determinative method of ascertaining legislative intent, we have indicated that such action strengthens the conclusion that the Legislature did not intend to achieve the results that the amendment would have achieved, if adopted.") (Citation omitted).

The negative cases in this first category are those relied upon by Appellees. However, there are no negative cases in the second and, most importantly, third categories. In implied preemption cases, the repeated failure to enact contrary measures "strongly suggests" that existing law does not embody those features. *Allied Vending*, 332 Md. at 304; *Skipper,* 329 Md. at 493; *see also Altadis*, 431 Md. at 319 ("The General Assembly's rejection of bills imposing the same requirements as the local legislation is significant in a preemption analysis.").[31]

The implied preemption authorities, where amendment rejection is relied upon, emphasize the "repeated" failure of legislative change. Equally important, we think, is the entity doing the rejecting. A failure in a single committee of the General Assembly is not

---

[31]     Each of the cited decisions involved a finding of implied preemption. However, there is no reason to believe that the same post-enactment legislative history is not equally significant in a finding of no preemption.

as significant as a failure by floor vote in one chamber of the Legislature. Here, we have a failure on the floor of the House in three successive sessions. Such an event is almost as rare as this year's super blood wolf moon eclipse.[32]

Appellees discount the invocation of the Amendment Rejection Theory here, arguing that the legislative history for 1992-94 reflects a "legislative stalemate" where the General Assembly rejected express preemption as well as amendments that would have specifically authorized more stringent local regulation by some subdivisions. In our view, this is not an accurate reflection of the legislative record.

Important here is the "contemporary legal context," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381 (1982), that faced the General Assembly in 1992 (and in 1993 and 1994). Following hard on the heels of the Supreme Court's decision in *Mortier*, and in light of a published opinion of the Attorney General that State law did not impliedly preempt more stringent local regulation of pesticides, an industry-friendly bill sought to completely and expressly preempt local pesticide regulation. To gain support for what had become a controversial measure, proponents over a three-year

---

[32] Because of the General Assembly's strong committee system, it is unusual for a bill to clear committee only to subsequently fail on the floor. Three times in a row is astonishing—almost as rare a "three-part" event as the trio of lunar phenomena coinciding to create a "super blood wolf moon eclipse": (1) the reddish hue that occurs during a lunar eclipse's "totality" phase; (2) the eclipse occurs during the traditional January "wolf moon" full moon; and (3) the moon appears as a big and bright "supermoon" because it is closer to Earth than usual. *See* Andrew Fazekas, *How to See the Last 'Blood Moon' Eclipse of the Decade*, NATIONAL GEOGRAPHIC (Jan. 20, 2019), available at: https://www.nationalgeographic.com/science/2019/01/how-to-watch-super-blood-wolf-moon-lunar-eclipse/.

37

period were forced to sacrifice uniformity with increasingly broader grandfather clauses and exemptions for local regulation.[33] These were not new authorizations, as Appellees claim, but more akin to provisos or savings clauses protecting authority that already existed.

Nor is Appellees' argument against amendment rejection advanced by their assertion that all that was being rejected was express and not implied preemption. Once again, opponents of the three bills were striving to protect local authority over pesticide regulation in the face of any type of preemption. Legislators voting against the bill—many of whom voted in favor of the 1987 pesticide legislation, *see* p. 33—would have been shocked to discover that their votes were wasted and doomed from the start by implied preemption.

---

[33] Indicative of the reasons for opposing the preemption legislation was the March 4, 1993 written testimony before the Senate Economic and Environmental Matters Committee of the Chesapeake Bay Foundation:

> In assessing this bill we must ask, "Is our only means of achieving pesticide regulation uniformity by stripping local jurisdictions of their power to protect themselves?" This is a very serious question, for we will be denying citizens the right to protect themselves from local health and environmental problems associated with pesticides. And we would be doing so at industry's request because of largely unfounded concerns. The legislature over the past year, in considering other legislation dealing with state versus local control, has shown great deference to preserving the ability of local governments to meet local needs. It should be so here as well. Since this bill fails to balance local protection needs and citizen concerns with the interest of industry, the Chesapeake Bay Foundation is opposed to Senate Bill 429.

There was no ambiguity over what occurred in 1992, 1993, and 1994: the Legislature repeatedly rejected attempts to preempt local regulation of pesticides. This is a most compelling case of amendment rejection.[34]

## C. *Uniformity of Regulations*

Another secondary factor in determining whether state law preempts a field by implication is whether a "multi-tiered regulatory process . . . would invite chaos and confusion." *Altadis*, 431 Md. at 315 (quoting *Allied Vending*, 332 Md. at 303). To that end, Appellees stress that the General Assembly has intended to elevate the principle of uniformity as a *sine qua non* of pesticide regulation in Maryland. The County contends that it would be odd for the General Assembly's animating purpose to be "uniformity" for its own sake, rather than a substantive policy aim such as promoting agricultural yield or protecting the public health and environment. We agree with the County that the text of the Agriculture Article, its interaction with the broader statutory structure, and the General Assembly's legislative course indicate that "uniformity for uniformity's sake" was not the General Assembly's paramount interest.

To be sure, § 5-104(c) of the Maryland Pesticide Registration and Labeling Law states in aspirational, preamble-like fashion that uniform requirements between the states and the federal government are "desirable," albeit not mandatory:

Uniform pesticide requirements between the several states and the federal government are desirable to avoid confusion that endangers the public

---

[34] Although amendment rejection is usually regarded as post-enactment legislative history, the 1992-1994 episode serves as a pre-enactment setting for pesticide legislation enacted subsequently.

health and that results from diverse requirements, particularly relating to the labeling and coloring of pesticides, and to avoid increased costs to the people of the State due to the necessity of complying with diverse requirements for manufacturing and selling pesticides. Consequently, the Secretary, after public hearing, may adopt the rules and regulations of the appropriate agency of the United States government relating to pesticides, if the rules and regulations are applicable to and conform with the primary standards established by this subtitle.

However, we do not read this language to be so emphatic as to preclude any room for local regulations. First, uniformity is described as "desirable," not mandatory. Second, the focus of the statutory language is national and horizontal uniformity—at the federal and State level,[35] and not vertical uniformity—from one state to its subdivisions. Next, the qualifier that uniformity is desirable "particularly relating to the labeling and coloring of pesticides" is peculiar, given that, under FIFRA, states are generally prohibited from imposing any labeling requirements that are different from EPA's: by the terms of the federal statute, subject to certain exceptions, labeling *must* be uniform. 7 U.S.C. § 136v(b). Finally, the section concludes by stating that the Agriculture Secretary may ultimately choose to adopt federal regulations "*if* the rules and regulations are applicable to and conform with the primary standards established by this subtitle." (Emphasis added). By acknowledging that federal regulations may not necessarily "conform" to the

---

[35]   Of course, for the sake of national uniformity, federal agencies can "promulgate regulations pre-empting local legislation that interferes with federal goals." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 455 (2005) (Breyer, J., concurring).

State's own sense of appropriate standards, this provision contemplates potential variations between State and federal regulations.[36]

Nor is the "uniformity" language contained within the Pesticide Applicator's Law more availing to Appellees' argument. Section 5-204(13) of the Pesticide Applicator's Law states that "[f]or purposes of uniformity and in order to enter into cooperative agreements," the Agriculture Secretary shall "adopt use classifications and other pertinent pesticide regulation provisions that are established by the U.S. Environmental Protection Agency[.]" The qualifier "pertinent" indicates that the General Assembly does not envision blanket uniformity. And if the General Assembly desired nothing beyond simple uniformity with EPA, that would deprive the Agriculture Department of any ability to act according to its own volition. If that were the case, that would render as surplusage the other language from the same section of the Pesticide Applicator's Law that authorizes the Secretary to "[p]rescribe, when necessary, the time and conditions under which a pesticide may be sold, distributed, exchanged, or used in different areas of the State;" §5-204(2), and "[d]efine the formulations and establish the conditions and appropriate areas for application of any pesticide;" § 5-204(4).

More importantly, the General Assembly's course of legislative action illustrates that it does not intend to simply tether the State to federal requirements. The enactment of 2016's Pollinator Protection Act illustrates this dynamic. The Pollinator Protection Act

---

[36] Any variations between State and federal requirements would most typically mean that the State desires tougher standards than those otherwise permitted by EPA: under § 136v of FIFRA, federal requirements are generally a regulatory floor under which State law may not be less stringent.

added provisions to the Agriculture Article to restrict the use of neonicotinoids (a class of pesticides associated with colony collapse disorder in bees). Laws of 2016, Chapters 661 and 662. At the time of enactment in 2016, EPA had not undertaken similar restrictions regarding neonicotinoids. Indeed, Appellees note in their brief that Maryland was "the first State to pass legislation restricting consumer use of pesticides containing neonicotinoids[.]" As such, the very fact that Maryland was the first state to pass a law restricting neonicotinoid use demonstrates that the General Assembly is not inherently opposed to regulations that differ from, or go beyond, other state and federal regulations.

We further observe that, practically speaking, the abstract talisman of "uniformity" is simply a chimera in light of the widespread variations that *already* exist across the country with regard to pesticide regulation.[37] To name just one example: whereas the EPA currently uses a cost-benefit analysis when deciding whether to register a pesticide under FIFRA, the California Department of Pesticide Regulation "has rejected the consideration of benefits in its [own] registration process, except in extremely limited circumstances." Danica Li, *Toxic Spring: The Capriciousness of Cost-Benefit Analysis Under FIFRA's Pesticide Registration Process and Its Effect on Farmworkers*, 103 CAL. L. REV. 1405, 1439 (2015). As a result, California—the nation's largest agricultural

---

[37] We also note that the pesticide industry did not hesitate to sacrifice "uniformity" in 1992-94 in an attempt to win passage of a preemption bill. *See* pp. 15-17 and 35-39 *supra*.

producer—"has often denied registration to pesticides that the EPA has approved." *Id.* at

1442.[38] Nor are regulatory variations *within* states uncommon.[39]

Additionally, as mentioned earlier, in Maryland, compliance with the Chesapeake

and Atlantic Coastal Bays Critical Area Protection Program requires local jurisdictions to

pursue best management practices with respect to pesticides and agriculture. COMAR

27.01.06.02(E) (When developing Critical Area programs, local jurisdictions shall

"[a]ssure that best management practices for the control of nutrients, animal wastes,

*pesticides*, and sediment runoff be used to protect the productivity of the land base and

enhance water quality. These practices shall minimize contamination of surface and

ground water and, further, shall minimize adverse effects on plant, fish, and wildlife

resources.") (Emphasis added). It would be anomalous to conclude that the State values

---

[38] Other examples include that in the states of the Ninth Circuit—and only the states of the Ninth Circuit—discharges of pesticides from some aerial sprays have been considered a point source subject to Clean Water Act permitting. Joel Reschly, *Pesticides, Water Quality, and the Public Trust Doctrine*, 45 ENVTL. L. REP. NEWS & ANALYSIS 10938, 10939, 10945 (2015). Or that, in Pennsylvania, an advisory instruction on a pesticide's label related to use of the pesticide as an environmental hazard "shall be considered . . . as a further restriction on the pesticide's use." 7 Penn. Admin. Code § 128.103(b). Indeed, the first pesticide label included here in the record extract contains a bolded section stating that, specifically in New York State, the pesticide may not be applied to any grass within 100 feet of a water body.

[39] To name a few: Texas's general rules concerning "regulated herbicides" only apply to 54 of the state's 254 counties; its administrative code also has a separate section of related "County Special Provisions." Tex. Admin. Code, Title 4, §§ 7.52-7.53. Florida prohibits the aerial application (by fixed-wing aircraft) of organo-auxin herbicides in four specifically-named counties between the months of January and May. Fla. Admin. Code, Rule 5E-2.033(7). Additionally, New York has special restrictions on the use of certain herbicides when applied near vineyards in three western counties of the state. 6 CRR-NY §§ 321-324.

uniformity above any other consideration when the Critical Area Program actively tells counties to pursue their own pesticide control practices.

And counties have, in fact, enacted pesticide regulations pursuant to the Critical Area Program. *See* Baltimore County Code, § 33-2-204(b)(7) ("Within the boundary of a Chesapeake Bay Critical Area resources easement or reservation [that contains certain resources], a person may not . . . [s]tore, use, or apply pesticides, except for the spot spraying of noxious weeds consistent with the recommendations of the University of Maryland Cooperative Extension Service[.]"); Dorchester County Code, § 68-22(B)(5) (incorporating COMAR 27.01.06.02(E)); Harford County Code, § 267-63(F)(4)(a) ("Each agricultural operation in the Critical Area shall have and be implementing a soil and water conservation plan, approved by the Harford Soil Conservation District Office . . . [that] adequately address[es] the control of nutrients, animal wastes, pesticides and sediment runoff."); Prince George's County Code, § 5B-102(a)(5) (same language as COMAR 27.01.06.02(E)); Wicomico County Code, § 125-11(B)(8) (for the purposes of implementing the Critical Area, defining "buffer yard" to mean an area at least 25 feet wide, and which "shall be maintained primarily for the purposes of wildlife habitat and water quality and shall not be maintained in a manner that conflicts with these purposes such as by mowing or the application of herbicides.").[40]

---

[40]    The existence of this additional State authority for some counties to regulate pesticides undermines Appellees' argument that multi-tiered regulation would cause chaos or confusion. In addition, the 1992-1994 preemption failure was premised on the assumption that charter counties already had the authority to impose stricter pesticide regulations. That the existence of such authority might, at first, cause some difficulty and

(Continued…)

44

Finally, we note that by stressing that the State prioritizes uniformity, Appellees undercut their other main argument: that the Agriculture Department is so extensive and comprehensive a regulator as to preclude any room for local regulation. After all, if the General Assembly intended for pesticide regulations in Maryland to simply duplicate federal rules, without variation, that would leave little for the Agriculture Department to do beyond mimic EPA policies.

The notion that the Agriculture Department is so pervasive and comprehensive a regulator as to preclude any local regulation is further belied by certain public comments made by the Department itself. For instance, in 2016, MDA submitted a written opposition to the legislation, HB211/SB198, that became the Pollinator Protection Act, Laws of 2016, Chapters 661 and 662.[41] Its opposition was partly based on the fact that EPA "has always taken the lead on pesticide registration and labeling issues[,]" and that it is EPA that "has the resources, expertise and reach to evaluate the vast volume of data and information available worldwide to assess pesticide risk." The comment further noted

---

inconvenience for the pesticide industry does not rise to the level of chaos and confusion. Additionally, we suspect that certified applicators, having stressed their ability to scrupulously parse and follow the detailed instructions contained within the (thousands of) pesticide labels approved by EPA, will not be significantly burdened by Montgomery County's requirements concerning "listed" and "registered" pesticides.

[41] Earlier, in its 2015 Annual Report, MDA wrote that it had "spent a significant amount of time working to defeat" a bill that was a forerunner to the Pollinator Protection Act, and which MDA described as "anti-agriculture." In this same report, MDA said that it also "work[ed] to defeat" an "anti-agriculture" bill that—according to MDA's description—would have "banned the use of lawn care pesticides at child care centers, schools and on recreation center sand fields used by children under age 18[.]" Md. Dep't of Agric., *2015 Annual Report* at 11.

that MDA's Pesticide Regulation Section "is entirely specially and federally funded" (MDA receives federal funds to enforce FIFRA in the State) and that if the Pollinator Protection Act were enacted without additional funding, "federal funding could be compromised." At present, MDA's Pesticide Regulation program has only 13 authorized positions (only four of which are inspectors); other positions within the State Chemist's office are responsible for pesticide registrations, and the Mosquito Control Program has additional responsibility for the application of mosquito-controlling insecticides. Md. Dep't of Budget & Mgmt., *Proposed FY 2020 Operating Budget, Vol. II*, at 42-43, 46, 58. It is also important to note that the Department supported the early 1990's bills that would have preempted county pesticide regulations. (The Department submitted legislative comments supporting the bills in 1993 and 1994, and sent a favorable memo about the 1992 bill to the Senate.) This position was emphatically rejected by the House of Delegates on three occasions. The pervasive administrative regulation preemption factor cuts in favor of the County ordinance.

### D.  *Whether Local Control Has Traditionally Been Allowed*

A third factor in an implied preemption analysis is whether the General Assembly has exclusively regulated in an area "in which no local control has traditionally been allowed," *Altadis*, 431 Md. at 315 (quoting *Allied Vending*, 332 Md. at 302). To that end, we have already mentioned the county regulations enacted pursuant to the Chesapeake and Atlantic Coastal Bays Critical Area Protection Program's regulations. Additionally, we note that counties have enacted pesticide regulations with respect to stormwater management and other local concerns. In addition, as noted earlier, the 1992, 1993, and

1994 legislation expressly took note of those counties (and the Town of Manchester, in Carroll County) with pesticide regulations in a failed attempt to preempt local regulation. Therefore, it can hardly be said that the General Assembly was unaware of any concept of local authority to act in the field of pesticide regulation.[42]

**CONCLUSION**

In *Chaney*, 454 Md. at 545, the Court of Appeals, in concluding that the Surface Mining Act did not preempt local zoning and planning authority, stated: "it cannot be that the Council—and by extension, the citizens of Prince George's County—are powerless to restrict surface mining in those areas of the County where surface mining is no longer a safe and viable activity." (Internal quotation marks and citation omitted). We believe that a similar conclusion is appropriate here. Factors supporting our conclusion against preemption include: repeated failures to preempt, a lack of comprehensiveness along the lines of FIFRA, no pervasive scheme of administrative regulation, no conflict through frustration of purpose, and General Assembly recognition of local regulation of pesticides. Together, these factors point in one direction: the State has not prohibited local governments from regulating pesticides in the manner addressed by the County. Accordingly, we conclude that the citizens of Montgomery County are not powerless to

---

[42] Even though Maryland's pesticide laws do not expressly mention counties or political subdivisions (as did the federal statute considered in *Mortier*), the absence of this secondary preemption factor does not change our finding of no preemption. Given the longstanding General Assembly recognition of charter county pesticide regulation and the crushing evidence of amendment rejection, we cannot rule otherwise.

restrict the use of certain toxins that have long been recognized as "economic poisons" and which pose risks to the public health and environment.

                                                   **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED FOR ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**